HARRY PARSHALL v. THE STATE.

No. 338.    Decided March 22, 1911.

Rehearing Denied May 3, 1911.

1.—Gaming—Constitutional Law—Legislative Journals—Changing Original Purpose of Bill.

Sections 30 and 31 of article 3 of the Constitution of Texas do not require that the journals of either house shall affirmatively show what the original purpose in any bill introduced is or shall be; and where the Act was properly signed by the presiding officers of the two houses and approved by the Governor, filed in the Secretary of State's office and published under the authority of the State as a valid Act of the Legislature, it is absolutely conclusive of the validity thereof, and no extraneous evidence can be resorted to for the purpose of determining whether the Legislature has complied with every constitutional provision and changed the original purpose of the bill.

2.—Same—Title of Bill—Reading of Title of Bill—Signing of Bill.

Section 38, article 3, of the Constitution of Texas, does not require that the journals of the two houses of the Legislature shall affirmatively show what the title of the bill enacted is, or that the full title was read. But it requires that the journals must show the signing of the bill by the presiding officers of the two houses.

3.—Same—Caption of Bill—Subject in Caption.

The Act of the Thirtieth Legislature, page 107, concerning gaming and

keeping gambling houses sufficiently includes article 388b, defining the. offense of keeping a place for gambling .with cards, etc., and is not in contravention of section 35, article 3, of the Constitution of Texas. Following Singleton v. State, 53 Texas Crim. Rep., 625.

**4.—Same—Legislative Intention—Rules of Construction.**

In construing a statute the object is to ascertain and give effect to the intention of the Legislature. See opinion for other rules of statutory construction.

**5.—Same—Repeal by Implication—Two Statutes on Same Subject.**

The law does not favor repeals by implication, and they will not be adjudged to occur except when they are inevitable or the Legislature plainly means them; and when two statutes on the same subject are not irreconcilable, but can both stand and be effective, no repeal will be implied.

**6.—Same—Vagrancy Act—Gaming Act—No Repeal by Implication.**

The vagrancy Act defined by subdivision (k) of said Act by the Thirty-First Legislature does not either expressly or by implication repeal the gambling Act of the Thirtieth Legislature, page 107, 1907, or any part thereof. Davidson, Presiding Judge, dissenting. .

**7.—Same—Vagrancy—Gaming—House—Room—Distinct Offenses.**

The vagrancy Act defined by subdivision (k) of said Act, Thirty-First Legislature, 1909, is a separate and .distinct offense from that declared in article 388b, Act of the Thirtieth Legislature, 1907, page 107, not only on the point of distinction between a house and a room, but in a broader and more comprehensive sense. Vagrants are defined and punished by reason of the demoralizing tendency of their conduct or occupation, yet the same person may be also punished for a specific act, such as keeping a gambling house.

**8.—Same—Case Stated.**

The keeping of a house for gambling or gaming under the vagrancy Act of 1909 is a separate and distinct offense from that of "if any person shall keep any premises, building, room or place for the purpose of being used to gamble with cards" denounced by the gambling Act of 1907, for which the defendant was convicted. Davidson, Presiding Judge, dissenting.

**9.—Same—Rules of Evidence in Vagrancy—Support of Gaming Law.**

Rules of evidence by which vagrancy may 'be established are liberal, and the offense may be established by proof which would not be admissible to establish specific acts. This tends strongly to show that the vagrancy Act was intended to aid the enforcement of the gaming statutes and not to supplant them.

**10.—Same—Repealing Clause—Constitutional Law—Rule of Construction—Prior Laws.**

Where a repeal of prior laws is inserted in an Act in order to the unobstructed operation of such Act, and it is held unconstitutional, the identical provision for the repeal of such prior laws will fall with it. Therefore, if subdivision (k) of the vagrancy Act fixes a different penalty for the same offense as article 388b, Penal Code, it not being the intention of the Legislature to repeal the gambling law, it is unconstitutional and void because it attempts to put a person twice in jeopardy for the same offense, and therefore does not repeal said article 388b.

**11.—Same—Indictment—Keeping Room for Gambling.**

Where the indictment for keeping a room for the purpose of being used as a place for gambling with cards strictly followed the law, the same was sufficient.

**12.—Same—Continunace—Want of Diligence—Conclusion of Witness.**

Where defendant assumed to take the place of the process of the court in having the witness attend and did not apply for or issue legal process, he must abide by that if the witness did not attend; besides the testimony of the said

absent witness was but a conclusion of the witness with reference to the character of the room in which the gambling took place.

### 13.—Same—Requested Charges.

Where the requested charges pertained to other counts in the indictment not submitted, and those that were applicable were embraced in the main charge, there was no error in refusing them.

### 14.—Same—Evidence—Time of Offense—Other Transactions—Election by State.

Where the defendant was prosecuted for keeping a room for gambling purposes with cards under many counts in the indictment, the State had the right to introduce testimony under each of them; and where the offense for which defendant was convicted had to be shown by proof of many and continuous acts ·of gambling in the particular room alleged at any time prior to the time of the indictment within the time of limitation, there was no error in admitting in evidence other times that gambling occurred in said room, and the State could not be forced to elect.

### 15.—Same—Keeper of Room—Sufficiency of the Evidence.

Where upon trial of keeping a room for gambling purposes, the evidence showed that the defendant was the keeper of said room, and that it was commonly and frequently resorted to and used for gaming purposes, the conviction was sustained.

### 16.—Same—Argument of Counsel—Pardon.

Where, upon trial for keeping a room for gambling purposes, the State's counsel stated to the jury in his argument that it would be better to return a verdict of guilty, and that if necessary ask for pardon, than to acquit the defendant, and said remarks were orally withdrawn from the jury by the court, and the record further showed that said remarks were not alluded to by the jury until after they had arrived at a verdict, and that the same did not influence the jurors, there was no error.

### 17.—Same—Legislative Journals—Signing of Bill by Presiding Officer—Constitutional Law.

The Constitution does not require that the full contents of a bill as originally introduced shall be entered on the legislative journals with the whole title of the bill; and where the bills of exception of the appellant, and the journals of the house and senate showed affirmatively and clearly that the legislative bill in question was properly numbered, and that there was no other number of the same kind on the journals, and that it sometimes appeared on said journals by part of the title of the bill, and that it went through all the parliamentary stages to its final passage, and was properly signed by the presiding officers of both houses in the presence of same, which fact was properly entered upon said journals, approved by the Governor, etc., section 38 of article 3 of the Constitution of Texas was fully complied with and the bill was constitutionally passed by the Legislature. Davidson, Presiding Judge, dissenting.

### 18.—Same—Sufficiency of the Evidence—Bedroom—Hotel.

Where, upon trial for unlawfully keeping a room for gambling purposes, the evidence showed that. the room while apparently fitted up and occasionally used as an ordinary bedroom in the hotel, but that it was practically and continuously used and kept by the defendant as a place to gamble with cards, the conviction was sustained.

### 19.—Same—Continuance—Want of Diligence—Testimony not Probably True.

Where defendant's motion for continuance showed that his absent witness was not in attendance on the date he was subpoenaed to be present and that no further process was applied for or issued, and that it appeared that the defendant relied on his personal notice given to witness by defendant for his attendance, he can not complain of his absence upon the trial, and there was not sufficient diligence. Besides, the testimony of the absent witness was not probably true. Davidson, Presiding Judge, dissenting.

**20.—Same—Requested Charges.**

Where the requested charge did not announce a correct statement of the law, there was no error in refusing same.

**21.—Same—Requested Charges—Proprietor.**

Upon trial of keeping a room for gambling purposes it was not necessary to show that the defendant was the proprietor of such room, and there was no error in refusing a requested charge to this effect.

**22.—Same—Charge of Court—Article 723, Code Criminal Procedure.**

Article 723, Code Criminal Procedure, prohibits the Court of Criminal Appeals from reversing a judgment, unless the error of the charge of the court or the refusal to give a requested charge was calculated to injure the rights of the defendant.

**23.—Same—Evidence—Proprietor of Hotel.**

Upon trial of keeping a room for gambling purposes there was no error in introducing testimony of a witness who had some means of knowledge tending to show that the defendant was the proprietor of the hotel of which the alleged room was a part.

**24.—Same—Misconduct of Jury—Telephone—Burden of Proof.**

Where, upon trial of keeping a room for gambling purposes, the record showed on appeal that some of the jurors talked over the telephone with members of their families and the judge of the court in the presence and hearing of an officer, and that the rights of the defendant were not injured thereby, and that the rule that the State has the burden to show that there was no injury to defendant was fully complied with, there was no error. Distinguishing Early v. State, 51 Texas Crim. Rep., 382. Davidson, Presiding Judge, dissenting.

**25.—Same—Verdict, Certainty of.**

Where the verdict of the jury found the defendant guilty under a certain count as charged in the indictment, and the brief of the appellant's attorney stated that his client was convicted for the offense charged in said count, there was no error on the ground that the verdict was uncertain.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of keeping a certain room for gambling purposes; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Williams & Williams* and *Taylor & Gallagher,* for appellant.—On question that gambling Act was passed in violation of section 30, article 3, Constitution of Texas by so amending the bill as to change its original purpose: Ex parte Anderson, 46 Texas Crim. Rep., 372; Cox et al. v. State, 8 Texas Crim. App., 254; Hunt v. State, 22 Texas Crim. App., 396; State v. Tooker, 15 Mont., 8; State v. Bowman, 118 S. W. Rep., 711.

On question that presiding officers had not signed Act of Thirtieth Legislature, which passed the gambling law and was in violation of section 38, article 3, Constitution: Hunt v. State, 22 Texas Crim. App., 396; Ford v. State, 23 Texas Crim. Rep., 520; Wright v. State, id., 313; Ex parte Anderson, 46 Texas Crim. Rep., 372; State v. Glenn, 18 Nev., 34; State v. Mead, 71 Mo., 266; State v. Kiesewetter, 45 Ohio, 254.

On question that subject of bill must be expressed in title: Section

35, article 3, Constitution; Roddy v. State, 16 Texas Crim. App., 502; Adams v. San Angelo Waterworks, 86 Texas, 485; Giddings v. San Antonio, 47 Texas, 548; Missouri, K. & T. Ry. Co. v. State, 102 Texas, 153, 113 S. W. Rep., 916; Gulf, C. & S. F. Ry. Co. v. Stokes, 91 S. W. Rep., 328; International & G. N. Ry. Co. v. R. R. Commission, 99 Texas, 332, 89 S. W. Rep., 961; Tadlock v. Eccles, 20 Texas, 782.

On the question that the caption of said Act uses the words "and generally to suppress gambling" is not sufficient: Missouri, K. & T. Ry. Co. v. State, 113 S. W. Rep., 916.

On question of admitting evidence as to other times cards were played in said room than the time alleged in the indictment: McKenzie v. State, 32 Texas Crim. Rep., 568; Bishop New Crim. Procedure, sections 448 and 459.

On question that separate criminal transactions are alleged in the indictment and duty of State to elect: Batcheler v. State, 55 S. W. Rep., 491; Powell v. State, 47 Texas Crim. Rep., 155, 82 S. W. Rep., 516; Thweatt v. State, 49 Texas Crim. Rep., 617, 95 S. W. Rep., 517; Blackwell v. State, 51 Texas Crim. Rep., 24, 100 S. W. Rep., 774; Smith v. State, 100 S. W. Rep., 953.

On question of inadmissibility of other criminal transactions: Barnett v. State, 44 Texas Crim. Rep., 592, 73 S. W. Rep., 399; Smith v. State, 44 Texas Crim. Rep., 137; id., 401; Clifton v. State, 46 Texas Crim. Rep., 18, 79 S. W. Rep., 824; Henderson v. State, 49 Texas Crim. Rep., 511, 93 S. W. Rep., 550; Ball v. State, 44 Texas Crim. Rep., 489, 72 S. W. Rep., 384; Powell v. State, 47 Texas Crim. Rep., 155, 82 S. W. Rep., 516, and authorities cited above.

On the doctrine of election by State: Simms v. State, 10 Texas Crim. App., 131, and authorities above cited.

On question that State should be required to elect as soon as the evidence develops plurality of transactions: Blackwell v. State, 51 Texas Crim. Rep., 24, 100 S. W. Rep., 774; Lund v. State, 44 Texas, 85; Dalton v. State, 4 Texas Crim. App., 334; Cornell v. State, 80 N. W. Rep., 745; Bishop's New Crim. Procedure, sec. 459.

On question that defendant must be proprietor of room alleged: Gelber v. State, 120 S. W. Rep., 863; Reynolds v. State, 8 Texas Crim. Rep., 412; Jordt v. State, 95 S. W. Rep., 514; Bailey v. State, 50 Texas Crim. Rep., 398, 97 S. W. Rep., 694; Moore v. State, 33 S. W. Rep., 980; Clark v. State, 34 Texas Crim. Rep., 120; Tankersley v. State, 101 S. W. Rep., 997; Burton v. State, 16 Texas Crim. App., 156.

On question of charge on circumstantial evidence: Veasly v. State, 85 S. W. Rep., 274; Childers v. State, 37 Texas Crim. Rep., 392.

On question of oral charge to jury: Edwards v. State, 69 S. W. Rep., 144.

On question of not excluding testimony of impression and understanding of witness as to proprietorship of hotel: Campbell v. State, 10 Texas Crim. App., 560; Allen v. State, 15 Texas Crim. App., 320; Burton v. State, 16 Texas Crim. App., 156; Campbell v. State, 30 Texas Crim. App., 645; Curtis v. State, 59 S. W. Rep., 263; James v. State, 40 Texas Crim. Rep., 190; Funderburk v. State, 64 S. W. Rep., 1059; Thompson v. State, 57 S. W. Rep., 805; Swanner v. State, 58 S. W. Rep., 72.

On question of misconduct of jury in talking over telephone: Early v. State, 51 Texas Crim. Rep., 382, 103 S. W. Rep., 868; McCampbell v. State, 37 Texas Crim. Rep., 607.

The court erred in paragraph 4 of its opinion in this case, in holding that the vagrancy law of 1909 did not repeal and nullify so much of the Act under which appellant was convicted, as provides that if any person shall keep any premises, building, room or place for the purpose of being used as a place to gamble with cards, he shall be punished by confinement in the penitentiary.

1. A house of gambling or gaming is "a house or room whose use is intended to facilitate gaming purposes, and where sporting characters are invited to congregate for illegal amusements and gaming, or to take money or other things of value upon trials of chance, skill or endurance." Miller v. State, 35 Texas Crim. Rep., 650; People v. Wiethoff, 51 Mich., 203.

2. A person becomes the keeper of a house of gaming or gambling by the act of keeping a gambling or gaming house, that is, a house for the purpose of being used as a place to gamble or game.

3. The act of keeping any premises, building, room or place for the purpose of being used as a place to gamble is punished by article 388b of the Penal Code by confinement in the penitentiary. Penal Code, article 388b.

4. The person who performs the act of keeping a house (premises, building, room or place) for the purpose of being used as a place to gamble is punished by the vagrancy Act by a fine not exceeding two hundred dollars. Gen. Laws 1909, p. 112.

5. The act of keeping is the essential element and the gravamen of the offense punished by each of said statutes.

6. Two separate statutes prescribing different punishments for the same act are in conflict and the later in time will repeal the former. Fleeks v. State, 47 Texas Crim. Rep., 327, 83 S. W. Rep., 381; Robinson v. State, 2 Texas Crim. App., 390; State v. Smith, 44 Texas, 443; State v. Taylor, 85 S. W. Rep., 564; State v. McKee, 104 S. W. Rep., 486; 36 Cyc., p. 1095 F.

7. The vagrancy statute is presumed to be constitutional, and if one construction supports the Act and gives it effect and another renders it unconstitutional and void, the construction supporting the Act and giving it effect should be adopted, even though the other construction should be the more natural interpretation of the lan-

guage used. Sutherland et al. v. DeLeon, 1 Texas, 250; Galveston, B. & C. Ry. Co. v. Gross, 47 Texas, 428; Barker v. Torrey, 69 Texas, 12; State v. McAlister, 88 Texas, 287; Ex parte Mabry, 5 Texas Crim. App., 98; 26 Am. & Eng. Ency. Law (2d ed.), p. 640 and note 7.

8. The caption of the vagrancy Act is clear and concise, and contains no recitals directly or indirectly referring to the fact that the Act purports to deal with the subject of prosecution under other laws, and so much of said Act as so purports is void and can not be construed to destroy the plain provisions of the Act in harmony with the caption. Constitution of Texas, sec. 35, art. 3; Roddy v. State, 16 Texas Crim. App., 510-511; Adams v. San Angelo Waterworks, 86 Texas, 485; Giddings v. San Antonio, 47 Texas, 548; Missouri, Kansas & Texas Railway Co. of Texas v. State, 102 Texas, 153, 113 S. W., 916; Gulf, C. & S. F. Ry. Co. v. Stokes, 91 S. W. Rep., 328; International & G. N. Ry. v. Railroad Commission, 99 Texas, 332, 89 S. W. Rep., 961; Tadlock v. Eccles, 20 Texas, 782.

9. The proviso that the punishment prescribed by the vagrancy Act shall be cumulative does not prevent such Act from operating as a repeal of the penalty of imprisonment in the penitentiary for the act of keeping a room to be used as a place to gamble with cards. Fleeks v. State, 47 Texas Crim. Rep., 327, 83 S. W., 381; State v. Smith, 44 Texas, 443.

10. The proviso that a conviction under the vagrancy Act shall not bar a prosecution under any other law if construed to render the said Act unconstitutional and void is repugnant to the said Act itself, and said vagrancy Act should be construed as if no such proviso was contained therein. 36 Cyc., p. 1163 and note 64.

*C. E. Lane*, Assistant Attorney-General, for the State.

PRENDERGAST, JUDGE.—On March 5, 1909, the grand jury of McLennan County in the Fifty-Fourth Judicial District returned into court an indictment against appellant in which there were thirteen separate and distinct counts in as many separate paragraphs, though none of them numbered. All of them are based on article 388b of the Penal Code as enacted by the Thirtieth Legislature, p. 107, charging in various forms under this article a violation thereof on or about February 24, 1909. Some of them are based on the allegation as to the whole of the Waverly Hotel; others as to room No. 1 in that hotel and six of them as to room No. 6 therein.

As stated in appellant's brief, and as shown by the record, the appellant was convicted under count 3 thereof, which, after the necessary allegation as to the organization of the jury, etc., is:

"And the grand jurors aforesaid, upon their oaths aforesaid, do further present in and to the court aforesaid, that Harry Parshall did then and there unlawfully keep a room, to wit: room No. 6 in

the Waverly Hotel, which said hotel is situated on South Third Street in the city of Waco, McLennan County, Texas, being numbered 215, for the purpose of being used as a place to gamble with cards."

The record in this case is quite voluminous; a considerable portion of it is made up of motions, bills of exception, charges asked and various other proceedings as to other counts than that upon which the conviction was had.

After the State's evidence was all in—the defendant introducing no evidence whatever—the court announced that only four of the several counts—those four pertaining to said room 6—would be submitted to the jury by his charge. The four counts so submitted by him were designated in the charge, not by giving any numbers thereof in the indictment, but by distinguishing them by the allegations thereof severally. It is plain, therefore, that the record contains a great deal of unnecessary and improper matter. It should have been confined to the specific count on which the conviction was had. On account of this state of the record we have had considerable labor to hunt out therefrom the matters which are pertinent and necessary to be considered and passed upon in the disposition of this case.

In the disposition thereof we have not omitted any point raised or question made that bears upon the various proceedings of the court on the count under which the conviction was had. While we will not discuss all of the questions raised, we will discuss and determine the material ones on which the disposition of the case depends and is made.

1. It is properly raised and claimed that the said Act of the Legislature under which this conviction was had is unconstitutional because it was passed by the Legislature in violation of article 3, section 30, of the Constitution, which is: "No law shall be passed except by bill, and no bill shall be so amended in its passage through either house as to change its original purpose."

In order to sustain this contention one of appellant's bills of exception shows what is claimed to be all of the entries in the House and Senate journals about this bill from the introduction thereof until the final passage and enrollment thereof, and the signature of the President of the Senate and Speaker of the House of Representatives. By this it is attempted to be shown that the original purpose of the bill as first introduced was amended in its passage through both houses so as to change that purpose and thereby render it unconstitutional. The said bill of exceptions giving the proceedings of the two houses shows that both the title and body of the Act were amended in various ways and in various stages of its passage by both houses, and additions also made thereto. Article 3, section 31, of the Constitution, says:

"Bills may originate in either house, and when passed by such house may be amended, altered or rejected by the other." It will be

noted that neither of these provisions requires, nor both taken together require, that the journals of either house shall affirmatively show what the original purpose in any bill introduced is or shall be.

There are in our Constitution several provisions prescribing rules of procedure for the enactment of laws by the Legislature, but which do not require that the journals shall affirmatively show that these rules are complied with by the Legislature. Such as article 3, section 37, which says: "No bill shall be considered unless it has been first referred to a committee and reported thereon; and no bill shall be passed which has not been presented and referred to and reported from a committee at least three days before the final adjournment of the Legislature." And another, the one now under consideration, says: ". . . No bill shall be so amended in its passage through either house as to change its original purpose."

There are certain other constitutional provisions which positively require the journals to show certain facts, such as article 3, section 38, which is: "The presiding officer of each house shall, in the presence of the house over which he presides sign all bills . . . passed by the Legislature, after their titles have been publicly read before signing; and *the fact of signing shall be entered on the journals.*" And article 3, section 39, which provides that no law except the general appropriation Acts shall take effect until ninety days after adjournment, unless in case of emergency, etc., the Legislature shall by a vote of two-thirds of all elected members of each house, otherwise direct; *"said vote to be taken by yeas and nays, and entered upon the journals."*

The decisions by the courts of the different States of the United States show that they differ as to the construction of these two characters of constitutional provisions. One construction is that only where such constitutional provision affirmatively requires the journals to show given facts, can they be looked to for the purpose of determining whether the Legislature has complied therewith or not, and holding that where a constitutional provision does not affirmatively require that the journals shall show such given facts that the enrolled bill, filed in the office of the Secretary of State, which shows the signature of the respective presiding officers of each house and the signature of the Governor in approval and the publication of such Act by the State, is absolutely conclusive upon the courts, and that the journals, nor any other extraneous evidence can be resorted to for the purpose of determining whether the Legislature has complied therewith or not. The other construction is that the journals can and must be looked to to determine whether the Legislature has complied with every constitutional provision, even though such provisions do not require affirmatively that the journals shall show compliance therewith.

Both this court and our Supreme Court, in well considered opinions, have adopted that construction of the constitutional provision to

the effect that where the Constitution does not affirmatively require the journals to show a given fact, that the enrolled bill, properly attested by the presiding officer of each house of the Legislature, approved by the Governor, filed in the Secretary of State's office and published under the authority of the State as a valid Act of the Legislature, is absolutely conclusive of the validity thereof in accordance with the construction first mentioned just above. Ex parte Tipton, 28 Texas Crim. App., 438; Williams v. Taylor, 83 Texas, 672; El Paso & S. W. Ry. v. Foth, 44 Texas Civ. App., 275; same case, 101 Texas, 133. The Supreme Court of the United States has also pointedly and clearly held this. Field v. Clark, 143 U. S., 649; Lyons v. Woods, 153 U. S., 649. The courts of the following States have also so held: California, Indiana, Kentucky, Mississippi, Montana, Nevada, New Jersey New York, North Carolina, North Dakota, Pennsylvania, Utah and Washington. 36 Cyc., 972, note 7. We deem it unnecessary to quote the language of this court, our Supreme Court, the United States Supreme Court or any of the decisions of the States cited because they can readily be had and seen. Therefore, so far as this contention of the appellant is concerned, we hold that the Act in question is clearly not in violation of our Constitution.

2. It is also contended by appellant that the said Act of the Legislature is unconstitutional in that article 3, section 38, just above mentioned, was violated in that the journals of the Legislature do not show that the title of said Act, as finally passed, was read in full at the time of the signature of the respective presiding officers of each house. From this provision of the Constitution it is seen that it does not require that the journals of the two houses shall affirmatively show what the title of the bill enacted is or that the full title thereof was read. What it does affirmatively require is that the journals shall show only "the fact of signing." This fact is clearly shown by the journals. The authorities above quoted are applicable also here, so that the said Act is not violative of said article 3, section 38.

3. Again, it is claimed by appellant that the said Act of the Legislature is unconstitutional and void, because it is violative of article 3, section 35, of the Constitution. This exact question was before this court on this same statute and was well considered and decided adversely to appellant's contention in the case of Singleton v. State, 53 Texas Crim. Rep., 625. The reports, both of this court and the Supreme Court, contain many decisions to the same effect as to other Acts of the Legislature attacked on the same ground. We think it unnecessary to cite them, as we regard the question as settled and this Act is not violative of said section of the Constitution as contended by appellant.

4. We come next to the consideration of one of the most difficult of the many difficult questions in this case. It is contended by ap-

pellant that the Act of 1909, Thirty-First Legislature, p. 111, defining and punishing vagrancy repeals said article 388b of the Penal Code as enacted by the Thirtieth Legislature, p. 107, Acts of 1907, or at least that it repeals that portion of said article 388b under which this conviction was had. It is unnecessary to copy these two Acts or either of them, as they are quite lengthy and can readily be referred to and seen. Article 3, section 46, of our Constitution, imperatively requires the Legislature to enact effective vagrant laws. This Act of the Thirty-First Legislature was passed in obedience to and in compliance with that provision of the Constitution. The title of it is: "An Act to better define and punish vagrancy, prescribing the rules of procedure in the prosecution of vagrancy and fixing a punishment for vagrancy and repealing all laws and parts of laws in conflict herewith and declaring an emergency."

It is difficult sometimes to determine the scope, purpose and object of a given statute. This Act in question, however, is clear and explicit, for it is expressly and plainly stated in its title to be "to better define and punish vagrancy," and in section 1 "the following persons are and shall be punished as vagrants," and the emergency clause is, "the fact that there is no adequate law in this State to define and punish the offense of vagrancy," etc., so that there can be and is no doubt of the scope, object and purpose of this Act.

There are many rules laid down by the courts and text writers to be applied in the construction of statutes and the repeal thereof. There is practically no difference of opinion as to what these rules are. The difficulty lies in their proper application to the given statute.

The fundamental rule for which all the others are made and applied is, that in construing a statute the object is to ascertain and give effect to the intention of the Legislature. Our Supreme Court in the case of Edwards v. Morton, 92 Texas, 152-3, tersely and pertinently says: "The intention of the Legislature in enacting a law, is the law itself." To the same effect is the opinion of the U. S. Supreme Court in Frost v. Wenie, 157 U. S., 46; Atkins v. Fibre, etc., Co. (18 Wall.), 85 U. S. 272, and Jones v. N. Y., etc., Co., 101 U. S., 622. In fact, the courts of all the States and the text writers in effect all lay down the same rule.

"A clause in a statute purporting to repeal other statutes, is subject to the same rules of interpretation as other enactments, and the intent must prevail over literal interpretation. Even words of absolute repeal may be qualified by the intention manifested in other parts of the same Act." (36 Cyc., 1069. and note 15.)

Generally a repeal is either by express words or by implication. There are many phases of a repeal to be considered, whether express or by implication. The common form of express repeal is where an Act says in terms that such a statute, or clause of a statute, is repealed. "If, on the entire face of the repealing Act, its intent is

plainly less broad than particular words in it, such intent will pre-
vail in the construction, and in all respects a repealing clause, like
any other, will be rendered by the courts in the sense evidently
meant by the repealing power." (Bish. on Stat. Crimes, sec. 151.)
"Not infrequently a clause is inserted in a statute repealing all laws
in conflict therewith. If the provisions of the former and present
enactments are in indirect contrariety, the repeal takes place, but only
to the extent of the repugnance. If on the other hand by any rea-
sonable contracting, expanding, cutting short or extending of the
old laws, or the new, they can be brought into harmony without re-
peal, the interpretation should be so, and all suffered to stand to-
gether." (Bish. on Stat. Crimes, sec. 152.) Another rule is that
"every statute is to be construed with reference to the general system
of laws of which it forms a part and its meaning and effect is to be
determined in connection with other statutes on the same subject,
and, under certain circumstances, with statutes on cognate, and even
different subjects." (36 Cyc., 1144-1146.)

Now, applying these general rules, and others applicable, though
unnecessary to cite, let us determine whether this vagrancy Act in
question which makes vagrancy a misdemeanor and fixes the punish-
ment at a fine not to exceed $200, repeals either the whole of said
article 388b of the Penal Code, or that particular provision thereof
under which the appellant was convicted in this case. This State has,
for many years, had laws in force under different titles, chapters and
articles of the Penal Code and under the respective subjects, defining
theft and receiving and concealing stolen property and fixing a pun-
ishment for these offenses; also laws punishing persons for unlawfully
selling vinous, alcoholic, malt, intoxicating or spirituous liquors; also
for punishing persons who gamble; also defining houses of prostitu-
tion and punishing persons who run or operate them; also defining
and punishing specific acts of keeping a gambling or gaming house;
and also against one who unlawfully solicits orders for intoxicating
liquors in prohibition territory. Many, if not all of them, have been
amended from time to time for the purpose of making them more
efficient and to enable the courts to punish violators thereof with
more certainty and severity.

If appellant's contention is correct that subdivision (k) of said va-
grancy Act which is: "Every keeper of a house of gambling or gam-
ing" is a vagrant, making it a misdemeanor and fixing the punishment
therefor as such, repeals every other law passed prior thereto defining
and punishing the keeper of a house of gambling or gaming for any
given specific act, and especially that part of said article 388b, mak-
ing it a felony "if any person shall keep any premises, building, room
or place for the purpose of being used as a place to gamble with
cards," and fixing the punishment by confinement in the penitentiary
not less than two nor more than four years, then, with equal force,
it can be contended, and would perhaps be true. that said vagrancy

Act also repeals all of our laws on the subject of theft and receiving and concealing stolen property; and all of our laws punishing persons who unlawfully sell any vinous, alcoholic, malt, intoxicating or spirituous liquors, not only in any prohibition territory, but elsewhere in the State, for subdivision (e) of said vagrancy Act is: "Persons trading or bartering stolen property, or who unlawfully sell any vinous, alcoholic, malt, intoxicating or spirituous liquors," is a vagrant and shall be punished as such; also all of our laws defining gambling and punishing persons who gamble, for subdivision (f) of said vagrancy Act is: "Every common gambler or person who, for the most part, maintains himself as such" is a vagrant and shall be punished as such; and also our laws defining and punishing the keeper or persons who run or operate a specific and particular house of prostitution, for subdivision (j) of said vagrancy Act is: "Every keeper of a house of prostitution" is a vagrant and shall be punished as such; and also all of our laws making it unlawful and punishing persons who solicit specific orders for intoxicating liquors, for subdivision (q) of said vagrancy Act is: "Any person who unlawfully solicits orders for intoxicating liquors" is a vagrant and shall be punished as such. It is absolutely unthinkable that the Legislature intended such a wholesale repeal of all these laws on these various subjects in one fell swoop by the passage of said vagrancy Act.

This vagrancy Act is not and does not purport to be on any other subject than that of vagrancy. It does not amend or purport to amend any other law. It is not enacted, nor does it purport to be enacted, in lieu and instead of any other law or criminal statute other than on the subject of vagrancy.

Now, let us go to the repealing clause itself to determine whether or not it has the effect to expressly repeal said article 388b. In addition to what we have said above about the scope, purpose and object of this statute, the repealing clause itself is: "Section 6. And all laws and parts of laws in conflict herewith are hereby repealed; provided the penalties herein named shall be cumulative, and a conviction for any of the offenses herein named shall not be a bar to any other prosecution under any other criminal statute." This clearly does not by express mention or terms repeal said gambling Act, of which article 388b is a part, nor does it in express terms repeal any particular clause or provision thereof. In construing this section it is not only proper and necessary that the whole scope, purpose and object of this vagrancy Act shall be considered, but in connection therewith, all of our various statutes on the subjects which are claimed to be repealed shall be also looked to and considered. When this is done, we think it is perfectly evident and certain that the Legislature did not intend to repeal any or all of said Acts, and especially that clause of article 388b under which the appellant was convicted, but on the contrary the very reverse of this is true, for in limiting the first part of this section 6, where it says, "all laws

and parts of laws in conflict are repealed," it expressly declares and makes it certain that a conviction for vagrancy is merely cumulative and "shall not be a bar to any other prosecution under any other criminal statute."

Again, the Legislature can enact a rule or rules for the construction of its enactment and do this, either in a separate Act, or in the same Act. Snyder v. Compton, 87 Texas, 375; Great Northern R. R. v. U. S., 208 U. S., 452; 36 Cyc., 1105. Taking this section 6 in connection with the whole Act, it is reasonably certain and clear that after placing therein the first part stating, "all laws and parts of laws in conflict herewith are repealed," it occurred to the Legislature that some of the provisions of the body of the Act might be attempted to be construed to repeal some other criminal statute, other than the previous vagrancy law; hence, to prevent this construction it said: "Provided the penalties herein named shall be cumulative," thereby showing it did not intend to repeal any other law. Still, not satisfied that it had made its intention sufficiently clear, and in order to show that it did not, either expressly or by implication, intend to repeal any other criminal law, it added, "and a conviction for any of the offenses herein named *shall not be a bar to any other prosecution under any other criminal statute,*" thus making it absolutely certain that no other criminal statute was thereby repealed, for if "any other criminal statute" was thereby repealed, then no "prosecution (or conviction) under such other criminal statute" could be had and the penalty inflicted for vagrancy could not be cumulative.

If the Legislature had intended to repeal any or all of these several laws, claimed to be in conflict with the vagrancy Act, it could have done so easily and doubtless would have said so by specially mentioning them.

We will further consider whether this vagrancy Act repeals, by implication, said article 388b or any portion thereof. "The law does not favor repeals by implication and they will not be adjudged to occur, except when they are inevitable, or plainly the Legislature means them. Such legislative intent is never prima facie presumed. Hence, in restraint and limitation of repeals by implication, statutes are strictly construed." (Bish. on Stat. Crimes, sec. 154.) This rule is so elementary, has been so many times announced by this court and our Supreme Court, and substantially by the courts of other States which have passed on the question, we deem it unnecessary to cite other authorities. It is claimed that this vagrancy Act in the clause under discussion is in direct conflict with and covers substantially—if not identically—the offense in article 388b under which appellant was convicted, and by necessary implication it thereby repeals the felony penalty. It is also a well established rule that "when two statutes on the same subject can both stand and be effective, no repeal will be implied." The courts go so far under this rule as to state that "if it is possible to construe the later statute

as cumulative, such construction will be given to it, although its provisions differ from those found in the early statute." (McLain on Crim. Law, paragraph 92, and note 5; Cope v. Cope, 137 U. S., 682; United States v. Greathouse, 166 U. S., 601.)

The State contends that the offense of vagrancy defined by said subdivision (k) of the vagrancy Act, is a separate and distinct offense from that declared by article 388b under which appellant was convicted. We believe that this is unquestionably true—at least, on one point. The offense of vagrancy, subdivision (k) is: "Every keeper of a *house* of gambling, or gaming." The offense for which the appellant was indicted and convicted is that "he did then and there unlawfully keep a *room,* to wit: room No. 6 in the Waverly Hotel . . . for the purpose of being used as a place to gamble with cards." The gambling statute, article 388b, makes it a felony for any person to keep "any premises, building, room or place." Thus making it clear that there is a distinction between a *room* in that statute and a *house* under the vagrancy Act. This court has expressly held in Weiss v. State, 16 Texas Crim. App., 432, that " 'house' and 'room' are not used as synonymous or convertible terms," which was in effect approved in Hodges v. States, 44 Texas Crim. Rep., 445.

We do not care to limit our opinion on this particular phase of the difference between the two statutes, so that we will take up the question of whether or not the offense of vagrancy, denounced in the vagrancy Act, is the same as that defined in article 388b, in its broader and more comprehensive sense.

At common law a vagrant was originally understood to be an idle person without visible means of support who, though able to work for his maintenance, refused to do so. The idea conveyed by the word "vagrant" or "vagrancy" also had connected with it and as a part of it, not only an idle person, but one whose business, pursuit or occupation, or want of it, was vicious to society, and one who loitered or stayed about immoral places. The English vagrant Acts, as in effect defined by old English statutes and referred to in 4 Blacks. Comm., 169, also tended to show that this was the idea of a vagrant. Under modern legislation of many of the States of the United States, vagrants are defined to be and are punished for pursuing a business or occupation or profession of a vicious, illegal or demoralizing tendency, and the idea conveyed and intended to be conveyed thereby, was and is as to the status, course of conduct, business, pursuit or occupation, of such persons who are denounced as vagrants, and proven by showing many specific acts which make up their general course of conduct, status, business, pursuit or occupation in contradistinction to their committing a specific act. The idea further is that such persons are denominated vagrants, because their course of conduct, status, business, pursuit or occupation is habitual in its nature. Such, in effect, is shown to be the case in McLain on

Crim. Law, secs. 1018, 1137, 1248 and note 5. As illustrative of this, it is made an offense to keep a place for the illegal sale of intoxicating liquors and is declared that the building, or place where liquor is illegally sold or kept with the intent to sell, is a nuisance and the offense of keeping such a place different from that of illegally selling or keeping for sale. A further apt illustration of this is punishing a person as a vagrant who is a drunkard, or a common drunkard. In order to prove that a person is a drunkard, or common drunkard so as to be punished as a vagrant it would be necessary to show that drunkenness was his course of conduct, or condition of being, or status in, a continuous, or at least habitual, way. It would be necessary to show that he was drunk many or more than one time, in a public place or places, and that was his course of conduct habitually. This would be a different offense, and is a different offense, from each several specific act of drunkenness. One would not take the place of the other, and while such person might be punished for being a drunkard or common drunkard, it would not thereby prevent him from being also punished for each specific act of drunkenness which would go to make up his condition of being, course of habitual conduct or status. The same thing would also apply where a party was prosecuted and convicted as a "keeper of a house of gambling or gaming," by showing that that was his occupation, business, course of conduct, or pursuit, and would not thereby prevent his being punished for the specific act of keeping a particular gambling house, or room, which different specific acts would go to make up his business, occupation, course of conduct or pursuit. The criminality in such cases, vagrancy, drunkenness, etc., depends on the habitual character of the improper conduct. (McLain on Crim. Law, sections 1018, 1137, 1248 and note 7.) "So it does not constitute double punishment that the same person is punished for individual sales and also for keeping a nuisance." Oshe v. State, 37 Ohio St., 494.

"Cases are numerous in which proof of one crime is received to establish another; but the introduction of such proof does not bar an indictment for the offense not under trial. . . . In Maine it is held that specific sales may be prosecuted under a statute forbidding them, after the party has been convicted, under another statute, for having been at the time of making them a common seller; though the practice is familiar, that such sales were competent evidence to the charge in the first indictment. And it was adjudged in another case that 'to punish a person for keeping a drinking-house and tippling-shop, and also for being a common seller of intoxicating liquors, although the same individual act contribute to make up each offense, is not a violation' of the law which forbids a prisoner to be put in jeopardy twice for the same offense. So in Massachusetts the statutory nuisance of keeping a tenement for the sale of intoxicating liquor is held to be a distinct offense from the statutory one of being

a common seller of intoxicating liquor; therefore a conviction of the former is no bar to an indictment for the latter. Neither is an acquittal a bar to a prosecution for keeping the liquor with intent to sell it. And various other like points have been adjudged under statutes regulating or prohibiting the sale of intoxicating drinks," (Bish. on Crim. Law, sec. 1065), citing The State v. Maher, 35 Maine, 225; The State v. Coombs, 32 Maine, 529; Commonwealth v. Keefe, 7 Gray, 332; Commonwealth v. Hudson, 14 Gray, 11; Commonwealth v. Tubbs, 1 Cush., 2; The State v. Inness, 53 Maine, 536, 537, opinion by Walton, J.; The State v. Layton, 25 Iowa, 193; Commonwealth v. Hardiman, 9 Allen, 487; Commonwealth v. Bubser, 14 Gray, 83; Commonwealth v. Cutler, 9 Allen, 486; Commonwealth v. Lahy, 8 Gray, 459; Commonwealth v. McCauley, 105 Mass., 69; Commonwealth v. Sheehan, 105 Mass., 192; Commonwealth v. Hogan, 97 Mass., 122; The State v. Andrews, 27 Mo., 267; Sanders v. The State, 2 Iowa, 230; The State v. Glasgow, Dudley (S. C.), 40; The State v. Rollins, 12 Rich., 297; The State v. Conlin, 27 Vt., 318; Commonwealth v. Welch, 97 Mass., 593; Commonwealth v. Farrell, 105 Mass., 189; Commonwealth v. Connors, 116 Mass., 35.

"Our jurisprudence is full of instances in which two or a dozen distinct laws cover one question, or cluster of facts, and all stand together, parties having their election on which one to proceed. If the Legislature says that its statute is a revision of the whole subject, and meant to be a repeal of all prior laws relating thereto, no court will hesitate to give it this effect. But if, instead of saying this, it simply enacts what is consistent with the prior law, or reenacts such law, how can a court know that it means what it does not say, a repeal of laws which may subsist with those which it establishes? Hence, in principle, and equally on the better American authorities and on the English, the just doctrine is that, without exception, a statute in affirmative terms, with no intimation of an intent to repeal prior laws, does not repeal them, unless the new and the old are irreconcilably in conflict." (Bish. on Stat. Crimes, p. 170.) Again: "If the new law is not inconsistent with the old, why infer a repeal where none is declared? All enactments are to be interpreted in harmony with the common law; yet this law recognizes a variety of remedies for a single wrong, a variety of offenses committed by a single act, a variety of modes of procedure to gain a common right, a variety of jurisdictions over a given matter, a variety of results from a single cause. Nature recognizes the same. And for a court, disregarding the teachings of both, to declare for a repeal where the Legislature has not, is to enact, not interpret, the laws." (Bish. on Stat. Crimes, sections 160 and 162, and authorities cited.)

The rules of evidence by which vagrancy may be established have always been and are very liberal to the State. Much more so than in

perhaps any other offense, and it may be established by proof which would be inadmissible to establish specific acts. This tends strongly to show that this vagrancy Act was intended by the Legislature to aid and be in furtherance of the existing statutes on the subject of gambling and not to supplant or displace them. "A subsequent statute in aid of an existing statute will not operate to repeal it." (McLain on Crim. Law, section 93; State v. Taylor, 2 McCord, 483; State v. Cole, 2 McCord, 1; Lewis' Sutherland on Stat. Const., section 260, and authorities cited in note 63.) This court in the case of Fitch v. State, 58 Texas Crim. Rep., 366, has recently upheld our own statute making the pursuit of the occupation of selling liquors in local option territory a felony in aid and furtherance of pre-existing statutes denouncing and prohibiting the sale of intoxicating liquors therein. And see also Joliff v. State, 53 Texas Crim. Rep., 61. "If there is no repugnancy in the several remedies of different statutes with different penalties, they may coexist." (26 Am. & Eng. Ency., 738, and cases cited in note 2. See Wilson v. State, 53 Texas Crim. Rep., 556.) See also Ex parte Allison, 99 Texas, 455, and Ex parte Roper, 61 Texas Crim. Rep., 68, 134 S. W., 335; Fitch v. State, 58 Texas Crim. Rep., 366.

But suppose we are wrong in holding that the vagrancy Act makes a new and distinct offense from that of the Act of 1907, Penal Code, 388b, so that both can stand, and instead, that the vagrancy Act makes the "keeper of a house of gambling or gaming," a misdemeanor punishable by fine not exceeding $200, precisely the same offense as "if any person shall keep any premises, building, room or place, for the purpose of being used to gamble with cards," denounced by 388b making it a felony and fixing the punishment at confinement in the penitentiary not less than two nor more than four years, then we recognize that both can not stand, and that one or the other must fall. The question then is, which shall stand, and which shall fall? And what was the legislative intent?

We have shown above that the intent of the Legislature was not to repeal the gambling law, nor any part of it. Hence, the following rule: "The different sections or provisions of the same statute or Code should be so construed as to harmonize and give effect to each, but if there is an irreconcilable conflict the later in position prevails." Lewis' Suth. on Stat. Const. (2d ed.), sec. 268, p. 514, citing Ex parte Thomas, 113 Ala., 1, 21 So., 369; Hand v. Stapleton, 135 Ala., 156, 33 So. 689; Van Horn v. State, 46 Neb., 62, 64 N. W., 365; Omaha Real Est. & T. Co. v. Kragscow, 47 Neb., 592, 66 N. W., 658. And, "If a conflict exists between two statutes or provisions, the earlier in enactment or position is repealed by the later. *Leges posteriores priores contrarias abrogant.* Where there is an irreconcilable conflict between different sections or parts of the same statute the last words stand, and those which are in conflict with them, so far as there is a conflict, are repealed, that is, the part of a statute

later in position in the same Act or section is deemed later in time, and prevails over repugnant parts occurring before, though enacted and to take effect at the same time. This rule is applicable where no reasonable construction will harmonize the parts. It is presumed that each part of a statute is intended to coact with every other part; that no part is intended to antagonize the general purpose of the enactment. To ascertain the legislative intent every part of an Act, and other Acts in *pari materia,* are to be considered. One part of an Act may restrict another part—an early section a later, and vice versa; but if one part is so out of line with other parts and the general purpose of the Act that it can only operate by wholly neutralizing some other part, then the latter provision is supreme as expressing the latest will of the law maker. Hence, it is a rule that where the proviso of an Act is directly repugnant to the purview, the latter is repealed by it." (Lewis' Sutherland's Stat. Const., sec. 280.) These rules apply, and subdivision (k) of the vagrancy Act must fall. Again, "A repealing clause in a statute may be valid, although every other clause is unconstitutional, if such is plainly the legislative intent. But where the repeal is intended to clear the way for the operation of the Act containing the repealing clause, thereby showing an intention to displace the old law with the new, if the latter is unconstitutional the repealing clause would be dependent and inoperative. 'Where the evident purpose of the repeal is to displace the old law and substitute the new in its stead, the repealing section or clause, being dependent upon that purpose of substitution, necessarily falls when falls the main purpose of the Act.' An unconstitutional statute can have no effect to repeal former laws or parts of laws by implication, since, being void, it is not inconsistent with such former laws." (Sec. 245, Lewis' Sutherland's Stat. Const., citing Railway v. Galveston, 96 Texas, 520; Randolph v. Builders' & Painters' Supply Co., 106 Ala., 501, 17 So., 721; People v. Fleming, 7 Colo., 230, 3 Pac., 70; Miller v. Edwards, 8 Colo., 528, 9 Pac., 632; Fesler v. Brayton, 145 Ind., 71, 44 N. E., 37; Stephens v. Ballou, 27 Kan., 594; Wells v. Hyattsville, 77 Md., 125, 26 Atl., 357, 20 L. R. A., 89; State v. Benzinger, 83 Md., 481, 35 Atl., 173; Campau v. Detroit, 14 Mich., 276; Westport v. McGee, 128 Mo., 152, 30 S. W., 481; Harbeck v. Mayor, 10 Bos., 366; People v. Dooley, 69 App. Div., 512, 75 N. Y. S., 350; State v. Thrall, 59 Ohio St., 368, 52 N. E., 785; State v. Buckley, 60 Ohio St., 273, 54 N. E., 272; State v. Jones, 66 Ohio St., 453, 64 N. E., 424, 90 Am. St. Rep., 592; State v. Beacom, 66 Ohio St., 491, 64 N. E. 427, 90 Am. St. Rep., 599; State v. Buckley, 17 Ohio C. C., 86; Matter of Roberg's Assignment, 18 Ohio C. C., 367; United States Mfg. & T. Co. v. ————————————, 19 Ohio C. C., 358; Collins v. Bingham Bros., 22 Ohio C. C., 533; Porter v. Kingfisher County Com'rs, 6 Okl., 550, 51 Pac., 741; Barringer v. Florence, 41 S. C., 501, 19 S. E., 745; Galveston & W. Ry. Co. v. Galveston, 96 Texas, 520, 74

S. W., 537; Ex parte Davis, 21 Fed., 396.)   In State v. Blend, 121 Ind., 514, 23 N. E., 511, 16 Am. St. Rep., 411, the court overruled the prior case of Meshmeier v. State, 11 Ind., 482, which holds a contrary doctrine, and declares that the latter case is inconsistent with all the other cases on the subject, citing Tims v. State, 26 Ala., 165; Sullivan v. Adams, 3 Gray, 476; Childs v. Shower, 18 Iowa, 261; Shepard v. Milwaukee Gas L. Co., 6 Wis., 539; State v. Burton, 11 Wis., 50; Devoy v. Mayor, 36 N. Y., 449; State v. Hallock, 14 Nev., 202, 33 Am. Rep., 559; McAllister v. Hamlin, 83 Cal., 361, 23 Pac., 357; Orange County v. Harris, 97 Cal., 600, 32 Pac., 594; Carr v. State, 127 Ind., 204, 26 N. E., 778, 11 L. R. A., 370; People v. Butler St. Foundry & I. Co., 201 Ill., 236, 66 N. E., 349; Commonwealth v. Fowler, 18 Phila., 573.   Also, "A law is entire where each part has a general influence over the rest, and all are intended to operate together for one purpose.   In such case the invalidity of that purpose will affect the whole Act.   Nevertheless, if only one incidental provision is invalid, that may not render the whole Act void.   It is not entire in that sense.   Where a repeal of prior laws is inserted in an Act in order to the unobstructed operation of such Act, and it is held unconstitutional, the incidental provision for the repeal of prior laws will fall with it.   An Act was passed to dissolve municipal corporations and provided the manner in which they might reincorporate.   The latter was the object of the enactment, and that being held unconstitutional the former was also invalid.   In such cases the object of the Legislature is frustrated; when the void part is eliminated, there is not a complete Act remaining expressive of the intent of the Legislature and sufficient to carry it into effect." (Lewis' Sutherland's Stat. Const., sec. 302, vol. 1), citing Quinlon v. Rogers, 12 Mich., 168; State v. Commissioners, 38 N. J. L., 320; Childs v. Shower, 18 Iowa, 261; Randolph v. Builders' & Painters' Supply Co., 106 Ala., 501, 17 So., 721; Carr v. State, 127 Ind., 204, 26 N. E., 778, 11 L. R. A., 370; Fesler v. Brayton, 145 Ind., 71, 44 N. E., 37; Barringer v. Florence, 41 S. C., 501, 19 S. E., 745; State v. Stark, 18 Fla., 255; Ex parte Towles, 48 Texas, 413.   So that we hold that if subdivision (k) of the vagrancy law provides the same offense as 388b, and attempts to make two punishments for the same offense, it not being the intention of the Legislature to repeal the gambling law, subdivision (k) is unconstitutional and void because it attempts to put a person twice in jeopardy for the same offense.   Const., art. 1, sec. 14.

We will not elaborate this doctrine, but content ourselves with merely stating these last propositions, as this opinion is already too lengthy.

Restated:   What we hold on this point is:

First:   That the vagrancy Act does not, either expressly or by implication, repeal the gambling Act or any part of it.

Second:   That the "keeper of a house of gambling or gaming"

under the vagrancy Act is a separate and distinct offense from that of "if any person shall keep any premises, building, room or place for the purpose of being used to gamble with cards" denounced by the gambling Act for which appellant was convicted; but if we are mistaken in this second holding, then:

Third: That subdivision (k) of the vagrancy Act is unconstitutional and void, because it fixes a different penalty for the same Act, and expressly undertakes to keep both Acts in force.

This brings us to this immediate trial, and the questions arising therein, which we will now decide.

5. The court did not err in overruling appellant's motion to quash that count of the indictment under which appellant was convicted, because it strictly followed the law.

6. The court did not err in overruling appellant's motion for continuance. The motion shows that it was on account of the absence of George Weathered. A subpoena was issued on March 11 requiring the witness to appear at court on March 24, 1909; service was had thereunder on the witness March 15, 1909; about March 17 the case was set for trial on March 29, 1909. The motion says that the witness was duly notified that the case was set for March 29, 1909, and that he never disobeyed a subpoena. It is not shown when, where, nor by whom he was notified that the case was set for March 29. Presumably this was done by the appellant or his authority. It is not shown that the witness agreed to be present on the 29th. It is not shown that he was present on the 24th, as was his duty in obedience to the subpoena. The appellant, thereupon, assuming to take the place of the court in having the witness to attend, must abide by his action if the witness did not attend later. No other process was issued for him until after the trial began on March, 29, so that no sufficient diligence was shown to procure the attendance of the witness.

On the count under which appellant was convicted, the motion shows, it was expected to be proved by the witness that room No. 6 was furnished, fitted up and run as a regular sleeping apartment in the hotel during the time the appellant was charged with the commission of the offense; that it was promiscuously and constantly rented out and assigned to guests as a bedroom and that it was not at any time set apart or furnished to be used for any character of gambling; that it was not kept for the purpose of a place to be used to gamble with cards or to which people would resort for the purpose of gambling with cards. It is seen by this that a part of what was expected to be proved by the witness was a conclusion and not a fact. It is shown by appellant in his brief that the room was used and rented out occasionally as a bedroom for guests. The overwhelming testimony of the witnesses shows that the room was kept by the appellant for the purpose of being used as a place to gamble with cards, even though it was used as a guests' room as other rooms were so used in the hotel. If the witness had sworn to the conclusion,

as stated in the motion, that the room was not so kept, his testimony was untrue in the light of the record and it was not error to refuse to continue the case on that account. Snodgrass v. State, 36 Texas Crim. Rep., 211. Any place which is kept for the purpose of gaming, even though it may be put to other uses, and even though its principal use it for some lawful object, is a place kept for gaming. 20 Cyc., 893.

7. Appellant requested many charges. Most of them pertained to other counts in the indictment. Such of them as were applicable were either given by the court, or were embraced in the main charge of the court; so that there was no error either in the court's charge together with the special charges requested by appellant and given or refusal to give the special charges which were requested by appellant.

8. Appellant has several bills of exception to the testimony of some of the witnesses, claiming that the first State's witness, McNamara, by his testimony having fixed the time of the commission of the offense in the summer of 1908, that the State should be confined to that particular time at which the said room was used for gaming, and that evidence of no other time could be introduced, and sought to require the State to elect which act it would rely upon for conviction and to exclude proof of any and all others. The court did not err in either not requiring an election or confining the testimony to any one given transaction. Under the many counts in the indictment the State had the right to introduce testimony under each of them. The offense charged and under which appellant was convicted was to be shown by proof of many and continuous acts of gambling in the particular room at any time prior to the return of the indictment, within the time of limitation, which tended to show that the room was kept as a place to gamble with cards. The offense charged and for which appellant was convicted is a continuous one and it was entirely appropriate for the State to prove more than one use of the room for the gambling, and in fact the many times of the use thereof for that purpose. The rule, which is well established in this State, that other distinct crimes can not be proven when a party is indicted for one special act which act of itself constitutes a crime does not apply.

9. It is also claimed that the testimony is insufficient to show that the appellant was the keeper of said room to be used for gambling purposes. We have carefully gone over, several times, the testimony on this subject. It is amply sufficient to show that the appellant was the keeper of said room and that it was commonly and frequently resorted to and used for gaming purposes. Many persons, in various walks of life, resorted there for the purpose of gambling and gambled with cards many times. Frequently there were a large number of persons in the room gambling. The appellant was shown, with reasonable certainty and by full proof, to have been present and participated

in the games. Different indicia of gaming were found there and kept there. Lunches were served to persons who were engaged in the gambling. Liquor was also served in the same way. The testimony is amply sufficient to show that all this was done by or with the knowledge and consent of the appellant. At the beginning of each game each person engaged therein paid fifty cents and the evidence is amply sufficient to show that he himself received and appropriated this fifty cents. The room was shown to be resorted to practically continuously and at all times of the day and night and was understood generally by persons shown to have indulged in gambling to have been known as a place where they could, and would gamble with cards. It is unnecessary to recite in detail any or all of the testimony of the several witnesses.

10. Complaint is made of the closing argument of the county attorney wherein he urged the jury to abide by the law and uphold the law, and convict the appellant, and wherein he is shown to have said: "Far better would it be for you to return a verdict of guilty if the law and facts so demand, and that when the verdict had been returned you twelve men should crawl out of this court on your hands and knees, crawl out of the city, down by Lorena, Temple and Taylor, and crawl up the granite steps of the State capitol, and present in person an application for a pardon to the Governor of the State, than that you should trample in the dust the laws of Texas. We live under a beautiful government, different departments of this government charged with different duties. You, as jurors, become a part of the government charged with the enforcement of the law. There is a Governor and a board of pardons who have their duties to perform. Let us do our duty nearest our door and trust that the other departments of the government will do their duty as given them by the laws of the State." This speech of the county attorney shows to have been in response to a speech of one of the appellant's attorneys. The record shows that the court at once orally instructed the jury to disregard the argument of the county attorney about a pardon for the defendant in this case. The jurors all testified on a hearing of the motion for a new trial that they did disregard the county attorney's remarks on the subject of pardon and that it had no influence whatever with them in arriving at a verdict and that it was not even referred to by the jury or any of them until after they had arrived at a verdict and it appears it was written out, then a mere suggestion was made by one of the jurors on the subject which was at once dismissed by the others and that the remarks by the county attorney had no influence whatever upon them in finding a verdict. The appellant did not request a written charge to the jury on the subject. There was no error committed in this particular.

11. On the motion for new trial the appellant claimed that the jurors had been guilty of misconduct in that several of them talked

over the 'phone to various persons before a verdict was found. The testimony is given by the officer who had them in charge, and each of the jurors. It is to the effect that several of the jurors, while they were in a body and in the presence of one another and in the presence and charge of the officer, called up over the phone their wives or some friend who lived close to where they lived, informing them of the fact that they were on the jury and would be kept together and could not come home that night. That some of them called up the trial judge to know if they could go to a picture show that night. He referred them to the appellant's attorneys; that they thereupon communicated with one of the attorneys and in effect got the consent, over the phone from this attorney, to attend the picture show in a body, etc. The testimony on this point clearly shows that nothing was said by any of the jurors to any person over the phone about the case, or anything in connection therewith. This testimony also clearly shows that no injury whatever resulted to the appellant by reason of any of these calls or conversations over the phone or by their attendance upon the picture show with the consent of appellant's attorneys; so that the court did not err in refusing to grant a new trial on that ground.

12. It is also claimed by the appellant that the verdict is uncertain, because it does not show under which count the appellant was convicted. We have examined the record fully as to this and have reached the conclusion that the verdict is not uncertain on that account or any other, and that the court did not err in overruling the motion for new trial because thereof.

There being no reversible error in the case, the judgment of the lower court is in all things affirmed.

*Affirmed*

Davidson, Presiding Judge (dissenting), and will make a few observations expressing reasons.

ON REHEARING.

May 3, 1911.

PRENDERGAST, Judge.—The appellant, through his attorneys, has filed a motion for rehearing earnestly contending that this court in the original opinion erred in several particulars. Knowing the ability, learning, and sincerity of appellant's attorneys in this case, notwithstanding the great length of the opinion of the court before, we deem it appropriate to go some further into the various matters presented in this motion for rehearing. In considering this motion we have again thoroughly gone over the record and all the questions raised. We will probably not take up and discuss each of them, as it is unnecessary, yet we have fully considered each.

1. Complaint is made that this court erred in the original opinion

in holding that the Act of the Thirtieth Legislature, p. 107, is not unconstitutional on the various grounds originally attacked. But particular emphasis is laid upon that provision of the Constitution contained in article 3, section 38, requiring the presiding officers of each house to sign bills when passed, after their titles have been publicly read before signing; "and the fact of signing shall be entered on the journals," contending and claiming that the said journals did not show that the said bill had been so signed, and claiming that the said bill as signed is of an entirely different caption from the one as promulgated and published as the said Act of the Legislature.

Appellant's bill making this contention claims to show, and we believe substantially shows, all that the journals of the two houses of the Legislature contain pertaining to said bill. This bill of exceptions, and the journal of the house itself, shows that "House Bill No. 84" was introduced in the Legislature by Mr. Dean on January 14, 1907, the sixth day of the regular session of the Thirtieth Legislature. This journal and bill of exceptions show that this bill is "House Bill No. 84," "A bill to be entitled an Act to amend article 388 of the Penal Code of the State of Texas so as to make it unlawful to bet at a game played with dice at any place." It is not shown by this bill of exceptions, nor by the house journal, neither is it necessary under the Constitution, what the full contents of that bill, as originally introduced, was, nor that the entry in the journal made by the journal clerk was the whole of the title of the said bill No. 84, as introduced by Mr. Dean. The bill of exceptions and the journals of the house and senate show affirmatively and clearly that this identical bill was properly referred to one of the house committees; that it was afterwards reported by that committee to the house, read a second time and amended in several particulars, read a third time and was finally passed by the house, properly transmitted to and received by the senate, properly referred by the president of the senate—the Lieutenant Governor—to one of its committees, reported by the committee to the senate with certain amendments, amended in some particulars and finally adopted by the senate after being severally read three times, properly transmitted back to the house with a report of what the senate had done thereto, then printed in the house journals in full as passed by the senate; that the house refused to concur in the senate amendments on the motion of Mr. Dean, the author of the bill, and requested a free conference committee to adjust the differences between the two houses. The journals of the house and senate both show, as stated by said bill of exceptions, that this free conference committee was appointed by each house. Then appellant's bill of exceptions itself and the journals of both the senate and house show:

"Pages 1100 to 1103 of the house journal, and pages 748 to 752 of the senate journal, both of which were offered in evidence, show the free conference report to both the house and the senate, and the

same is in all things identical with the bill as finally passed and promulgated as law in the Acts of the Thirtieth Legislature and under which the indictment in this case was drawn.

"Page 572 of the senate journal and page 1103 of the house journal each show the adoption by the respective bodies of the free conference committee report, both of which were offered in evidence.

"The following was offered in evidence from pages 794-5 of the senate journal: Bills and resolutions signed. The Chair (Lieutenant Governor Davidson) gave notice of signing, and did sign, in the presence of the senate after their captions had been read, . . . House Bill No. 84, 'An Act to amend article 388 of the Penal Code of the State of Texas, so as to make it unlawful to bet at a game played with dice at any place.'" (In this journal entry other bills were also identified and shown to have been signed.) "Pages 1154-5 of the said house journal: Bills signed by Speaker. The Speaker signed today, in the presence of the house, after giving due notice thereof, and their captions had been read severally, the following bills: . . . 'House Bill No. 84, An Act to amend article 388 of the Penal Code of the State of Texas, so as to make it unlawful to bet or wager at any gaming table or bank or pigeon hole, or jenny lind table, or nine or ten pin alley, such as are in the six preceding articles, or to bet or wager any money or anything· of value at any of the following games, viz.: poker, dice, jackpot, high dice, low dice, dominoes, euchre with dominoes, etc.; providing for the search and the seizure of any gambling device, equipment or paraphernalia and its destruction, and generally to suppress gambling, repealing all laws in conflict herewith, and declaring an emergency.' (In this journal entry other bills were also identified and shown to have been signed.)

"Page 1158 of the house journal, which was introduced in evidence, shows that House Bill No. 84 as finally amended by the free conference committee was duly and properly enrolled."

The journals of both houses show that there was no other "House Bill No. 84" than the said bill introduced by Mr. Dean and traced by this bill of exceptions and the journals of both houses through both houses from the first introduction thereof until the final passage, signing and enrollment and approval by the Governor. The journals of each house do not in every instance give the full title of the said bill. It is sometimes identified simply and solely as "House Bill No. 84;" sometimes in addition a part of the title or caption thereto is given; at other times more of the caption or title is given, and sometimes the full title or caption is given as it was finally enacted into a law. In every instance it is designated "House Bill No. 84," whether only part or all of the caption is given. To take the record of the journal in each house from first to last, there is not a shadow of doubt as to the identity of "House Bill No. 84" and that the bill as finally passed and became the enactment of the Legislature under which this prosecution was had, is that identical

bill and no other, as identified by these various methods and statements thereof. Neither is there a breath of suspicion that said "House Bill No. 84," is any other bill than the one which finally became the enactment of said Legislature. It occurs to us that with this tracing of this "House Bill No. 84" and unquestionably identifying this particular bill as the final Act of the Legislature and no other, that when the senate journal, as shown thereby, and the said bill of exceptions of the appellant states pointedly, clearly and distinctly as follows:

"Bills and resolutions signed. The Chair (Lieutenant Governor Davidson) gave notice of signing and did sign in the presence of the senate after their captions had been read . . . House Bill No. 84" (then the journal clerk entered only a part of the title to the bill) ; and when the house journal and appellant's bill of exceptions shows: Bills signed by Speaker. The Speaker signed today, in the presence of the house, after giving due notice thereof and their caption had been read severally, the following bills, . . . House Bill No. 84" (and then the journal clerk entered only a part of the title to this Act, but more of it than the senate journal showed), and all this, followed up by the printing of this bill in full, word for word and letter for letter in the journal of each house, and as stated by appellant's bill of exceptions, "and the same is in all things identical with the bill as finally passed and promulgated as law in the Acts of the Thirtieth Legislature, under which the indictment in this case was drawn;" and all this still followed up by the Act as thus finally passed, being filed in the Secretary of State's office as an archive thereof, on which original bill is shown the genuine signature of the proper officer of the senate that said bill passed the senate by a vote of twenty-nine for and only one against (the senate journal gives the names of each senator who voted for and the one who voted against), and the genuine signature of the proper officer of the house that said bill passed the house by a vote of ninety-nine for and seven against (the house journal giving the names of each member who voted for and against the bill), and also upon which bill is the genuine signature of the Lieutenant Governor, the Hon. A. B. Davidson, president of the senate, and of the genuine signature of the Hon. Thos. B. Love, Speaker of the House of Representatives, and the genuine signature of the Hon. T. M. Campbell, Governor of Texas, in approval of said bill, would satisfy any and every one beyond a shadow of doubt or breath of suspicion, that this identical bill and no other as originally and all through the journals designated, "House Bill No. 84," is the bill shown to be signed and that the journals of both houses affirmatively show "the fact of signing" it. It seems to us to contend otherwise is sheer folly.

So that we adhere to our original opinion that the said Act of the Legislature is not unconstitutional on the said grounds on which it is attacked. In addition to the authorities cited in the original

opinion on this point, we add these:   State v. Larkin, 90 S. W.,
917; Presidio County v. City National Bank, 44 S. W. Rep., 1071;
Ball v. Presidio County, 27 S. W. Rep., 706; Railroad v. Stewart,
48 S. W. Rep., 804.

As stated in the original opinion, the authorities therein cited establish, beyond question, the validity of the said Act of the Legislature, and that the same is not in any way unconstitutional.

2.   In view of the attack of the judgment on the claimed insufficiency of the evidence to show that appellant was the keeper of said room, and of several charges requested and refused, and the overruling of appellant's motion for a continuance, we deem it appropriate to give the substance of the testimony of the various witnesses.

Guy McNamara, who was the constable of precinct No. 1, in the city of Waco, where the offense with which appellant was charged is alleged to have been committed, testified in substance:   That he knew the appellant and the Waverly Hotel in the city of Waco, and by his testimony—as all of the other witnesses did—fixed its locality; that in the late summer of 1908 he and his deputy, Early Sparks, went into this hotel in the daytime and found appellant and others gambling with cards in room 6; that he did not then arrest them, but told them if they would promise not to gamble up there any more he would not then make them pay a fine; they promised they would not.   A few weeks afterwards he caught appellant and others in the same room gambling with cards; both times they were betting and had their money on the table in front of them; appellant was in all the games.   Witness later saw others gambling there; when he caught them in the first game appellant at his demand opened the door from the inside and let him in.

Charley Slaughter testified:   That he was in the sand and gravel business in Waco; knows the appellant and identified the Waverly Hotel and room 6 therein; he played poker and gambled in said room in November or December, 1908; Parshall was in the game; there were four in the game; he was invited by appellant to go there and play poker and gamble; appellant asked the witness when they were down in the saloon if he did not want to play a little poker; appellant told him that a couple of country fellows besides himself and witness would be in the game.   The constable caught them in this game; none of the parties attempted to run, but one of them got on the bed and covered up his head with a pillow; on this occasion appellant opened the door and let the constable in; there was a bed and other bedroom furniture in this room; they all stopped playing before the constable was let in, and they hid or tried to hide all of the cards, money, etc.

Bud Dunn testified:   He was in the saloon business; knew appellant and the Waverly Hotel and room 6 therein; his place of business was about a block and a half from the hotel.   "I have played some poker up there in the Waverly Hotel," and was there when the con-

stable made a raid and arrested him and others. That was some two to four months before the trial of this case. Appellant was in the game; they were playing poker and gambling money. "When I played up there I paid fifty cents, which I understood was for cleaning up the room. It was my understanding that everybody who took part in the game were to pay fifty cents, but it was my understanding that there was to be no 'take-off' in the game. A 'take-off' is gambling-house rent, where they pay so much an hour to engage in a game. I do not think that Parshall ever told me what it was for, but I won't be positive; I think it was just an understanding that we should pay that much. My understanding was that it was to go to cleaning up the room. That was never explained to me directly by Harry Parshall; it may have been explained to me indirectly; I just paid that fifty cents. Before we all went up to play it was understood that we would get that room to play in. I do not know that we said anything about the room to anybody, but we just went up there to play poker. We knew that we could get a room up there because it was a hotel, and a hotel lets rooms. I went right upstairs when I got there. We met Jim Hancock upstairs, and he led the way to this room. The whole bunch was up there in the hall. Nobody at all was in the room until we went in. We had just started to play when we paid that fifty cents; someone threw down fifty cents and said 'here's me,' and all the rest did the same. We just put the money on the table. My understanding was that this fifty cents was for cleaning up and taking care of the room, something like that. We did not get that understanding then; that had been my understanding before; I had played up there before. I do not remember who all was in the other games that I played up there. I guess the thing that impressed that particular game on my mind was the fact that we all got arrested. I had to pay a fine for this game, and I guess that made me remember it better than the others. When we all said 'here's me' with fifty cents I do not remember whether Parshall paid fifty cents or not. As well as I remember, all the others paid fifty cents. I was not the only man that paid fifty cents. . . . A bunch of people playing cards there in a room, chewing tobacco, smoking, and spitting would litter up a room a right smart. . . . We spoke of sending out and getting some whisky that day. We very often sent out and got a lunch. . . . I do not remember any of those details (about the lunch, getting whisky, etc.,) because poker playing with me is just like anything else."

Arthur Crow testified: He was a farmer; lived at Gholson up above Waco a short distance; he knew the Waverly Hotel and has lived in the county since 1881. "I have been engaged in some gambling there (at the Waverly Hotel) within the last few months. That was some time last fall." They played poker, and he shows that there were some four to six persons engaged in the game. That was one of the games in which the constable came up there. "I went up

there to that hotel to play poker. Charley Franks suggested to me that we go up there and play poker. I had known him five or six years."

Charley Franks testified: He lived in Waco and was a bartender; worked at the Horse Shoe Saloon; knows the Waverly Hotel and the appellant. Has known him several years. He went up to the Waverly Hotel to play poker; does not remember all who were in the game besides the appellant and himself, but names four others. "We had not been playing but a few minutes at that time when in walked Guy McNamara." He arrested all of them. "I do not know how you would state what it was for, but we gave fifty cents to pay for cards, or something. We all paid fifty cents . . . put it on the table. Mr. Parshall never said a word. I gave that fifty cents because I supposed that was what they all did. . . . I only know that I paid fifty cents to play. It had not been but a few minutes since we paid that fifty cents before Guy McNamara came up there. I had been up there before this time that Guy McNamara came up there and arrested us." He fixed this time at shortly before Christmas. "I think I have been up there since Christmas. I went up there to play poker. A fellow from the country told me that he would stake me to play poker and I took up that proposition. I had been up there two or three times previous to this. I was under the impression that we paid that fifty cents for cards or expenses— something like that. We did not have any lunch brought up there that time while I was there. I was not there but a little while until ·Guy McNamara came. This was in room 6. There was a bed in there. The room was furnished up for a bedroom. I suppose Parshall paid for cleaning up the room."

Eugene Crump testified: He lived in Waco and was in the real estate business; knew the appellant; was in the Waverly Hotel about three months before the trial. A poker game was going on there that night; he had been around the hotel several times. "I do not remember how many games I have seen there in the hotel. I did not stay very long the night I was up there. They were playing poker when I left. The reason I left was that the game was full. I was looking for a poker game when I went up there. I do not think I played. The game was full. By being full I mean that the chairs were all taken; the table was surrounded."

Dr. S. A. Morse testified: He lives in Waco and has lived there for several years. Knew appellant for two years and the Waverly Hotel; was there when the game was raided before Christmas; has been there since but could not tell the exact times. "I could not tell you the men's names that were in the game. I think that Parshall was in the game. He was in the game for one. I think there were four or five or six probably in the game. I do not think I have been there more than once since. I have been there probably three times altogether. I am not certain about the number of times I have been

there. I have been there twice since Christmas that I know of. I do not know the man's name who went with me. I met him at the St. Charles. He was in the brewing business. We went up there to the hotel to play poker, of course. I was told that there was going to be a good, square game up there—business men. There is a lot of difference between a square game and a skin game. Parshall was not at all of those games. I think he was in one or two. I do not know whether I had any conversation with any of the hotel people or not. Someone downstairs told me where the room was. I do not know who it was, whether it was the clerk or someone else. There may have been one or two persons sitting around there in the room who were not engaged in the game. I spoke to Parshall about the door not being. locked and he said that was all right; that it did not amount to anything. When the officers came down there and arrested us they first got up and looked over the transom and then came in and arrested us. We did the best we could under the circumstances. I do not remember ever paying anything for being in the room but once or twice; that was fifty cents; they said that fifty cents was for the bed. Sometimes some of the boys would use the bed. Some of the boys, I believe, in the game told me that this fifty cents was for the bed. There was one bed in that room. I think there were seven players up there when we paid that fifty cents. I paid fifty cents; the room we were in was fitted up. as a bedroom. Each one of the rooms that we were in was. The Waverly Hotel is a place of considerable size. A bunch of men playing cards, chewing tobacco, smoking and spitting around litter up a room a right smart. I think there was a lunch sent for with this money that was taken up there. There were cigars, lunch, whisky and so on sent for. That might be what that money was for, so far as I know; I do not know what it was for. Each individual paid fifty cents. There was only one fifty cents taken up in the same game. We had lunch several times. The latest we ever played there was probably about two o'clock at night. We went to playing about ten or eleven o'clock. I never did pay anything directly for the lunch. I do not know what the others did."

Mrs. M. B. Koller testified: She worked at the Waverly Hotel some time during the fall of 1908; was chambermaid. She worked there five or six weeks before Christmas. Identifies room 6 therein. "I had occasion, while I was there to clean up that room as a part of my duties as chambermaid; I was employed by Mr. Parshall. At that time he purported to have charge of the hotel there. I found a center table in room 6 and some decks of cards. I saw men go backward and forward to this room. I saw Mr. Parshall go in and come out of that room; I did not know any of the other people at all; the only one I knew was Mr. Parshall. That door was always locked. I worked up there about a week. That happened every day while I worked there. I asked Mr. Parshall for a job when I was

employed there. He referred me to Mrs. Parshall. He was the man I looked to for my pay."

Jim Hancock testified: He was in the liquor business in Waco; knew appellant and the Waverly Hotel. "I have been in poker games up there in the Waverly Hotel. One when Parshall was present. I could not say how many games I have been in there since the time Harry Parshall was present but a few. Parshall was in the game with the rest of them. I could not say how many were in the games there. I never paid any attention to that. I do not pay any attention to poker games, or anything of that kind, unless something comes up to make me remember it. Guy McNamara came up there and arrested us."

Early Sparks testified: He was deputy constable under McNamara; knew the Waverly Hotel and appellant. He and McNamara caught a game with cards there two or three months before the trial. Appellant was in the game. He and the constable went upstairs and he climbed up and looked over the transom and saw several of them playing poker; saw the whole game over the transom; they arrested them and they all paid a fine.

Will Nichols testified: He knew the Waverly Hotel and appellant; was present with appellant and others in a poker game in the hotel when McNamara made the raid. McNamara told them that he would let them go that time if they would not play up there any more. Thinks Parshall said he would not play if he would let him off then.

Jim Riddle testified: He lived in Waco for many years; knew the appellant several years and the Waverly Hotel; he was in a game of poker in November, 1908, and names four others, including appellant, besides himself, who were in the game. They commenced the game in the evening and was arrested in the game that night about 12 o'clock. "We were playing with cards. I suppose we had twelve or fifteen decks of cards. I do not know where they came from. I did not take any of them with me. I think there were seven engaged in the game. The occasion for us having so many decks of cards was that people sometimes get so they don't like one deck, and they want to change decks, something like that. I do not know how came me to go up there that time. I was by myself when I went up, I suppose. The place where we were playing was upstairs. I suppose the reason that I found it when I had never been up there before was that I had been told that it was up there. I must have been told that it was up there; I do not remember the circumstances. I could not tell you why I went up to this room at all (room 6). I suppose I was looking for a poker game or I would not have been up there. Appellant was in the game. I do not think he was there all the time from the time we went there in the afternoon until 12 o'clock that night. I do not remember about him going out and coming in, but I do not think he played all the time during the time we were there."

W. B. Hays testified: He was in the fire insurance business and real estate business in Waco with his brother, and the firm name of the business was Hays Brothers. "We receive the rents for the Waverly Hotel. The rents are left with us at the suggestion of Mrs. Olive, who is the owner of the building, and we send the money to the bank. I think I understand who is supposed to pay the rent on the hotel, but who actually does pay it I could not say. I understand that Parshall is the one. I think he has had the Waverly Hotel about a year. The property is owned by Mrs. A. B. Olive. She is not here. I think we have been receiving the rents through this year. I do not remember of ever going around to the hotel but once; I went around to see Parshall and he was not there. A young man was in the office; I do not know who he was. The matter of repairing the hotel is a matter between Parshall and Mrs. Olive. I do not think there has been any repairing done recently. There was some little repairing something like six or eight months ago. I do not know, except as a matter of general hearsay and general understanding, who runs the Waverly Hotel. I have nothing to do with the transaction of renting. I do not know except in a general way of Parshall having any rental contract with Mrs. Olive. I do not know personally that Parshall exercises any control over those premises."

Mrs. M. L. Scott testified: She knew appellant and has known him since she went to work there in November as chambermaid. She worked there in November of 1908. Mrs. Parshall employed her; she believed she had no conversation with appellant in regard to working there. Mrs. Parshall was his wife. "I witnessed a game of cards up there in those rooms one time. That was on last Thanksgiving day. It was in room No. 6. Mr. Parshall was there in the game. I do not know exactly how many played in the game. Three or four sat around the table. I saw cards and chips on the table. I suppose they were poker chips. I sometimes had occasion to clean up this room No. 6. A big iron table was in the room. Sometimes Mr. Parshall told me not to clean up the room. Mr. Parshall paid me off each time. He paid me off himself. His boy brought me the money the time he fired me. His boy came and told me that his father had made other arrangements and that they would not need me any more. That was young Parshall, Harry Parshall's son. Parshall just told me sometimes to let it (room 6) alone, and I left it alone. When I did clean it up I think I found some poker chips there. I have something here that I found in the room there (producing poker chips). I found those things and others like that in there. I also found gaming cards in there. There were several loose decks of cards there that had been left in the room."

Early Sparks reintroduced testified: He identified the Waverly Hotel by its number and street, corresponding with the description in the indictment. Speaking of the Waverly Hotel, he said: "That is

a good sized building, and I would judge that there' are thirty or forty rooms upstairs. I do not know that I could say for certain who owns the Waverly Hotel. Harry Parshall is boss and proprietor down there." On cross-examination: "I have never lived at the Waverly Hotel since Parshall has been there. I have never rented a room there. I have eaten there. I do not remember who was in the clerk's office when I was there. I know of my own knowledge that Harry Parshall is the proprietor of that hotel, because he looks after the interests of it. I have seen him looking after the interests of it around the hotel there; he is the main man around there. I guess my testimony that Parshall is the proprietor down there is a conclusion. I do not know how many children Harry Parshall has down there; he has a wife, I think, and two or three boys. As a matter of fact, I do not know whether Harry Parshall is proprietor of the hotel or not."

The testimony establishes and clearly authorizes the jury to believe beyond a reasonable doubt that the appellant was the keeper of room No. 6 in the Waverly Hotel as described in the indictment; that while apparently it was fitted up and probably occasionally used as an ordinary bedroom in the hotel, that it was also practically continuously used and kept by appellant as a place to gamble with cards and that it was practically continuously for months during the latter part of 1908 and the early part of 1909, so used and kept by him and resorted to for that purpose. That the appellant received the fifty cents, which was paid by each of the other persons who played in the game, for the lunches, cigars, whisky and cleaning up of the room during said months. The conviction is brought to the unprejudiced mind by this testimony, which can not be gainsaid, that this room in this hotel was known by persons who know such things as a place that was kept for gambling, and that gambling was practically continuously carried on therein for months during the latter part of 1908, and the early part of 1909, and that appellant was the keeper thereof, and that this evidence directly and expressly connects the appellant with said room as the keeper thereof for gambling purposes and that it was a common resort for that purpose. Many persons, from four to eight, and a greater number, were many times during said months shown by this testimony to have been gambling there. They went there for that purpose, knew that they could gamble when going there. So that the testimony clearly justified the jury in finding the defendant guilty as charged and in our opinion no other verdict could have been rendered than that of conviction, by an honest, unprejudiced jury.

3. It is claimed that this court erred in holding that the motion for a continuance by the appellant was correctly overruled. This was the first application for a continuance. The diligence shown is that a few days after the appellant was arrested under the indictment, on March 11, 1909, he caused a subpoena to be issued for the witness

Weathered, commanding the witness to be present at the trial on March 24, 1909, which seems to have been the day that the case was first set for trial. The witness was properly served with this, but with no other process or subpoena to appear on March 24, 1909. The motion shows that the case was later set for trial on March 29, 1909, and says: "Said witness George Weathered, duly notified that this cause was so set and that said witness had never disobeyed said subpoena until the call of the case on March 29, 1909;" that immediately after the case was called and the witness did not answer on March 29, 1909, appellant on that day, March 29, 1909, had an attachment for him and that the witness did not thereafter appear. The motion for continuance further shows that the witness was not absent by the procurement or consent of the defendant, and says: "This defendant alleges, *so far as he knows* there is no reasonable expectation that the attendance of the witness can be secured during the present term of this court." Article 597 of the Code Criminal Procedure, in prescribing the requisites of a first application for a continuance by the accused, states that it shall be necessary, if the same is on account of the absence of a witness, to state under oath the diligence which has been used to procure his attendance and it shall not be considered sufficient diligence to have caused to be issued, or to have applied for a subpoena in cases where the law authorizes the issuance of an attachment. ·

Article 518, Code Criminal Procedure, says: "It shall be understood that a witness refuses to obey a subpoena if he is not in attendance on the court on the day set apart for taking up the criminal docket, or any day subsequent thereto and before the final disposition or continuance of the particular case in which he is a witness."

Article 524, Code Criminal Procedure, is, "When a witness who resides in the county of the prosecution has been duly served with a subpoena to appear and testify in any criminal action or proceeding fails to so appear, the State or the defendant shall be entitled to have an attachment issued forthwith for such witness." Appellant's motion for continuance clearly shows that the said witness was not in attendance on March 24, the date he was subpoenaed to be present, but states "and said witness George Weathered, duly notified that this case was so set" (for March 29, 1909), and then states that said witness had never disobeyed said subpoena until the case was called on March 29, 1909. *When* he was notified otherwise than by subpoena is not shown, nor *by whom* he was notified otherwise than by said subpoena is not shown. We take it that the appellant or someone for him undertook to take the place of the process of the court and have the witness to attend at some other time different and later from that shown by the subpoena. Unquestionably then the appellant undertook to secure the attendance of the witness without any subpoena or attachment for him on March 29 and after he had failed to obey the subpoena by attending on March 24, the day it required

his attendance. When he failed to appear on March 24, under the above statutes, the appellant clearly had the right and it was his duty to then procure an attachment for the witness, but, instead of this, he relies upon himself or some other to procure the witness, without the proper process of the court. This court, in the case of Long v. State, 17 Texas Crim. App., 129, says:

"The onus is upon the defendant to establish the exercise of diligence in support of an application for a continuance. 'It shall be understood that a witness refused to obey a subpoena, · if he is not in attendance on the court on the day set apart for taking up the criminal docket or any day subsequent thereto and before the final disposition or continuance of the particular case in which he is a witness.' (Code Crim. Proc., art. 488.) Where a defendant is relying alone upon the service of a subpoena, then his application for continuance, in order to be good in point of diligence, should affirmatively show that that witness was in attendance on the day set for taking up the criminal docket, and thereby excuse his failure to resort to an attachment. The burden is upon the party seeking a continuance to show himself entitled to it by definite, exact and certain averments. (Walker v. The State, 13 Texas Crim. App., 618.) Defendant's witness in this case was not shown to have been in attendance when the criminal docket was taken up, and his failure to procure an attachment for him was such want of diligence as would deprive him of his right to a continuance; and the court did not err in overruling his application." In the case of Hutchinson v. State, 6 Texas Crim. App., 469, when the appellant in that case relied upon the promise of witness to attend but who did not attend— without a subpoena—this court says:

"Defendant further states in his motion that said East, and one Vaughn, who resides in Brown County, are material witnesses to his defense; that defendant had never had them subpoenaed because they both told him that they would appear at the term of the court when the case was tried, and testify; and that defendant, relying on their statements aforesaid, failed to have them subpoenaed. If the defendant did not take the necessary steps provided by law to secure the attendance of his witnesses, but relied alone upon their promises to be present at the trial, he took the risk, and must suffer the consequences." Again, where the appellant had had process issued, but under the direction of the court had turned it over to the officer of the wrong forum for execution and thereby failed to secure the attendance of the witness, in the case of Skipworth v. State, 8 Texas Crim. App., 135, this court says:

"The law requires of a defendant a rigid compliance with the exact terms prescribed for such applications, and if there is a lack of diligence, apparent from the application or otherwise, in securing the attendance of his witnesses, its mandate is inexorable and the trial must proceed. In terms most explicit it informs the defendant and

his counsel what shall constitute diligence, and if they see fit to rely upon matters outside the law to excuse their noncompliance with the law, they must take the consequences." See also Walker v. State, 13 Texas Crim. App., 618; Massie v. State, 30 Texas Crim. Rep., 64; Hill v. State, 18 Texas Crim. App., 665; Mixon v. State, 36 Texas Crim. Rep., 66; Harvey v. State, 35 Texas Crim. Rep., 545.

Besides this, the testimony of all the witnesses introduced, without doubt and without question, shows how and in what manner the said room No. 6 was fitted up and used and if the witness Weathered had testified to anything different from what is established by the testimony of all of these witnesses, it is apparent his testimony could not probably be true. See subdivision 2, note 643, p. 412, of White's Code Crim. Proc., for a large number of cases collated and cited on this point. We adhere to the opinion that there was no error committed by the lower court in overruling appellant's motion for continuance.

4. Appellant next urges in the motion for rehearing that this court erred in holding that the lower court did not err in refusing to give appellant's requested charges No. 2 and No. 6, which are as follows:

No. 2. "You are charged that by 'kept for the purpose,' as that term is used, is meant the chief purpose for which the same is set apart, used and maintained; that is, the reason, the object, for which the same was kept, as distinguished from the occasional use to which same may have been appropriated."

No. 6. "In this case you are instructed that it devolves upon the State to prove affirmatively by evidence, beyond a reasonable doubt, that the defendant, Harry Parshall, personally kept or was interested in keeping room No. 6, as the proprietor thereof, or that said room was under his personal control and management. Now, if from the evidence, or from the lack of evidence, you have a reasonable doubt on these questions, you will acquit the defendant, regardless of your findings on any other issues submitted to you in this case."

Charge No. 2 does not announce a correct statement of the law. It was not necessary that kept for gaming had to be the chief purpose for which room No. 6 was set apart. The law is that if it was kept for the purpose of gaming by the appellant and so shown by the evidence he was guilty under the statute under which he was prosecuted, even though the room may have been put to other uses, and even though its principal use was for some lawful object such as being used as a bedroom in the hotel and the law applicable to the question was aptly given in the court's charge. Toll v. State, 40 Fla., 169; State v. Eaton, 85 Me., 237; State v. Mosby, 53 Mo. App., 571; Smith v. State, 52 Ala., 384; Ulsamer v. State, 11 Ohio (reprint), 889.

Neither is charge No. 6 the law of this State under the statute and count of the indictment, under which the appellant was con-

victed. While it was proper to introduce proof by the State tending to show that the appellant was the proprietor of the Waverly Hotel and of room 6 thereof for the purpose of showing that he kept the room as denounced by the statute, yet it was not necessary to show, in order to sustain the conviction under the clause of the statute under which he was prosecuted, that he was the owner, proprietor, etc., thereof. Lett v. State, 21 S. W. Rep., 371; 14 Am. & Eng. Ency., 713. If he had been convicted under another clause of the law under the count in the indictment charging that he knowingly permitted the room to be used as a gambling room, then it would have been necessary and proper to have given this charge No. 6, because it was applicable to that phase of the law and one count of the indictment, but it was not necessary or proper to have given it, under the count wherein the defendant was convicted.

Besides this, the charge of the court, we think, sufficiently and aptly submits all of the questions under the count in the indictment under which appellant was convicted. Article 723, Code Criminal Procedure, prohibits this court from reversing a judgment unless the error of the charge of the court or the refusal to give a requested charge as appears from the record was calculated to injure the rights of the defendant. We think there was no error in the charge of the court and no error in refusing to give the charges requested by appellant; but even if there was, it is our opinion that such error was not calculated to injure and did not injure the right of the appellant.

5. The next complaint by appellant is that this court erred in holding that the lower court did not err in excluding the testimony of Early Sparks on appellant's motion, as shown by bill of exceptions No. 9.

In order to show this matter fully it will be necessary to copy this bill of exceptions in substance, at least. It is as follows:

"While the State's witness, Early Sparks, was on the stand the State's attorney asked him the following questions: 'Question: We ask—who runs, who is proprietor, boss of the Waverly Hotel?' To which he answered: 'Harry Parshall is proprietor down there.' The following questions were then asked by counsel for the defendant and answered, as shown by the following questions and answers: 'Q. Have you ever lived at the Waverly Hotel? A. No, sir. Q. Ever rented a room there? A. No, sir. Q. Ever eaten there? A. Yes, sir. Q. Do you know who was in the clerk's office when you ate there? Did you register? A. I do not remember. Q. How do you know of your own knowledge that Henry Parshall is proprietor of that hotel? A. He looks after the interests of it. Q. How have you seen him look after the interest of it? A. Around the hotel. Q. What have you seen him do? A. Why, I have just seen him around there acting like he was the proprietor; I judge he was the proprietor. Q. That is just exactly what we are getting at; is your testimony a conclusion? A. I guess it is a conclusion. Q. Harry Parshall has a

wife and seven children there at that hotel? A. I do not know how many. Q. He has one or two grown sons? A. Yes, sir; two or three boys about grown. Q. You have seen the boys exercise control there just as much as you have him? A. I have seen one of his boys on watch there at night. Q. As a matter of fact you do not know whether he is actually the proprietor of that hotel or not, do you? A. Well, I do not know that I do.' "

The appellant's attorneys then moved to exclude all of this testimony "because it is the opinion of the witness, hearsay, and not proper testimony to go before the jury with reference to proving the proprietorship of that hotel, and it shows conclusively that he has no personal knowledge of who is the proprietor."

It is our opinion that the testimony of this witness, as detailed by this bill of exceptions, shows that it is not hearsay, nor the opinion of the witness, nor does it show conclusively, as claimed by the bill, that he had no personal knowledge of who was the proprietor; and that it was proper testimony to go before the jury. The evidence of the witness shows that he did have some knowledge and some means of knowledge of testifying positively to what he did, tending to show that the appellant was the proprietor of the hotel; that he had been about it; that the appellant looked after the interest of it and around the hotel for that purpose. Appellant's objections that he was further made to say on cross-examination by appellant's able attorneys that he "guessed his testimony was a conclusion and that he did not know, as a matter of fact, whether appellant was the actual proprietor of the hotel or not," goes to the weight of the testimony and not to its admissibility. In our opinion it was clearly admissible. The whole testimony of the witness in which by cross-examination he was led to cast some doubt upon his own testimony was all for the jury to consider and not for the court to conclude that the testimony was inadmissible. There was no error in not granting the appellant's motion to strike out this testimony.

6. In view of appellant's earnest insistence that the court erred in not reversing this cause, because several of the jurors' talked with persons over the 'phone, after they were empaneled, it becomes necessary for us to state more fully than we did in the original opinion the facts as to this matter.

Appellant contends that the original opinion overrules, in effect, the case of Early v. State, 51 Texas Crim. Rep., 382, 103 S. W. Rep., 873. That case shows the jurors talked with others over the 'phone after they were empaneled, out of the presence, and without the permission, of the court. Article 728, Code Criminal Procedure, forbids this. This court in that case said it was contended that one of these two rules should apply: 1st, it will be absolutely presumed injury occurred to appellant, or 2d, the burden would be on the State to show injury could not have occurred. Then states that in McCampbell v. State, 37 Texas Crim. Rep., 607, this court held that where

jurors had separated and opportunity for them to be tampered with was shown, injury to appellant will be presumed. In further discussing the question in the Early case, Judge Henderson says: "Heretofore we have held with reference to the separation of the jurors, that those would be liable, if tampered with, to suppress the facts, and that therefore little reliance should be placed on their testimony, and the same rule would apply with reference to conversations. So that the necessity for the examinations of others than the jurors with whom such conversations occurred seems to be necessary." In that case not all of the jurors who talked were sworn and examined, and none of the parties they talked with were sworn or examined. So that case was reversed; the court said: "Therefore, we accordingly hold that the burden shifted to the State, was not discharged by it."

It is clear to us that the rule adopted and applied in the Early case was simply, that when the jurors are shown to have talked with others over the 'phone, out of the presence, and without the consent, of the court, after they are empaneled, the burden is on the State to show that no injury occurred to appellant thereby. We adhere to that rule in this case, and the Early case is not overruled by this.

In empaneling juries it is universal for the attorneys to test each juror on his oath to learn if they know anything of the case, and if they have any bias or prejudice against the defendant. The object being to get fair and impartial jurors who know nothing of the case. We have no doubt that was done in this case by appellant's able and competent attorneys and that each juror in this case fully met all these requisites. There is no intimation in this record that a single one of these jurors was otherwise than fair and impartial and knew nothing of the case when empaneled. There is no reflection upon either of them, and no intimation or suggestion that they were tampered with, other than that they talked with outside parties over the 'phone out of the presence, and without the permission, of the court. When such is the case, we do not assent to the implication that they will perjure themselves when testifying to whom they talked, and what was said over the 'phone, as might be inferred by the language of Judge Henderson in the Early case, where he says "little reliance should be placed on their testimony." As shown by the discussion by Judge Henderson in that case, it is only when a juror permitted himself to be "tampered with," that little reliance should be placed on his testimony.

Now let us see whether the State discharged this burden. In acting on the motion for new trial, the court below heard the sworn testimony. It was clearly shown by the officer in charge of the jury and otherwise that eleven of the jurors thus talked once, some twice or more times. Some a short, others a longer, time. He knew they were talking, did not try to hear all they said, but did hear some of it. He heard some talking to their home-folks about home affairs.

Did not know to whom they talked in each instance, nor what was said by the other party over the 'phone. The jury was kept in a body while all this talking occurred. The officer thought this was the custom with juries. No outside party called up any juror. No intimation that any juror was tampered with is shown by his testimony.

M. A. Sullivan, foreman of the jury, testified. He talked to his wife twice. Told her he was tied up on this case and would not be home. He did not discuss this case with her or anyone else. He did not know of any of the jury who did discuss the case with anyone else. Mrs. Sullivan, wife of the foreman, fully corroborated him. J. W. Bailey, another juror, testified: He talked to Judge Munroe, the presiding judge, asking if the jury could go to a moving picture show. The judge told them to ring Taylor & Gallagher, appellant's attorneys. He then called Mr. Taylor's residence and his son answered, and told him his father said it was all right. He also talked to his wife. He did not discuss this case with any of these parties. He was fully corroborated by Judge Munroe, and was told by the judge that so far as he was concerned they could go to the show if the jury would sit together, not separate, nor talk to anyone, and would get the permission of appellant's attorneys. He (Bailey) was also fully corroborated by Mr. Taylor, one of the attorneys for appellant, who gave his consent that they could go to the show, and also by Mr. Taylor's son. It seems Bailey's wife did not testify. W. W. Moore, another juror, testified: "I was a member of the jury that convicted Harry Parshall. I had some talks over the telephone; I talked with my wife and with my mother. I did not talk with anybody else. I did not discuss with them anything about this case. I did not have the permission of the court to talk. The deputy sheriff had a chance to hear my conversation; he was in the room with the balance of the jury; I said I wanted to talk, and he said go ahead. When I talked I rang 'country line' and called for Robinson, and then called for my residence and my mother's residence. I called by name. I did not hear any of the jury discuss this case with anyone." W. A. Cox, another juror, testified: He was a barber, and talked with his mother-in-law and Mr. Stowe, one of the proprietors of the barber shop where he worked. He did not talk with either of these parties about this case. Stowe, the barber proprietor, testified: He fully corroborated Cox, stating Cox asked him to send $2 around to the Dumas House, and this case was not discussed. It seems Cox's mother-in-law did not testify. J. T. Duncan, another juror, testified: "I talked over the 'phone; I talked twice. I talked to our next-door neighbor, Mrs. Scruggs. I did not discuss this case with her in any way. I did not talk to anybody else. I talked twice to her. I talked over the telephone twice. I rang them up myself; I rang by name." J. N. McBride, another juror, testified: He run a rooming-house. His wife was sick. He called up and talked twice

each day to his chambermaid, a negro woman, asking about his wife, and asked about the affairs of his rooming-house. He did not discuss the case with anybody. Lula Miller, McBride's chambermaid, fully corroborated him. C. A. Sherman, another juror, testified: He called up Miss Allen, the stenographer of the Garrett Hardware Company, where he and she worked, and told her he was on the jury and could not be down. He did not discuss this case. He was fully corroborated by Miss Allen. G. W. Gorham, another juror, testified: He talked to Smith Bros., the feed men, about business. Neither discussed this case. Nothing at all was said about it. Smith, the feed man, fully corroborated him. This talk was about some feed Gorham had ordered. Nothing was said about this case. Cal Taylor, another juror, testified: He called Mrs. Cline, a neighbor, and asked her to tell his wife he was on the jury and would not be home. He did not mention this case to her. Mrs. Cline fully corroborated him. N. S. Alexander, another juror, testified: He talked to his wife twice. Neither said anything about this case. Mrs. Alexander, his wife, fully corroborated him. The first time he told her he could not be home that night, and the second time he could not get away and would be gone another night. Nothing was said about this case. J. S. England, another juror, testified: "I live out in the Riesel community. I was one of the jurors that tried the case of the State of Texas against Harry Parshall. I did not discuss the Harry Parshall case with anybody but members of the jury while I was on that jury. I talked over the telephone while I was on the jury. I think I talked to McClain's livery stable. I left my horse down there and I called them up to tell them about it; that is here in town. I called up there to arrange about leaving my horse. I also talked to Mrs. Kayser at Riesel. I did not talk to her about this case; I talked to her to ask her to send word to my wife that I could not come home that night. I did not have any other conversation over the telephone with anyone. I did not discuss with anybody except the jurors in the case any fact relative to the case which we were deliberating upon. I do not know who it was that I talked to at that livery stable. Really, it was a wagon yard and trading place that I wanted, and I think there is a livery stable the next door, the adjoining place, and I called for it at that place, the livery stable. Really, I think Mr. Buchanan did the talking; he is the deputy sheriff. I know he rang, and I would not be positive, but I rather think he did the talking. I was in the sheriff's office then. After thinking about it, I believe Mr. Buchanan called Mr. McClain, and then I talked to him." T. P. Reagan, the twelfth juror, testified: He did not talk over the 'phone or otherwise to anyone about this case. John Walton, deputy sheriff, testified: Mrs. Delia, the juror Cox's mother-in-law, is in bed with nervous shock and hardly able to get around. Her house burned last night. Mrs. Moore, the juror Moore's wife, has gone fishing and was unable to be reached. His

mother's husband is sick and not expected to live, and Morris' mother could not leave on that account. Mrs. J. W. Bailey is sick.

The return on the subpoena made by Mr. Tilley, sheriff, was introduced and is as follows: "Came to hand on this April 19, 1909, and executed on the same day by attaching Miss Allen, Mrs. Cline, Mrs. Walter Moore not found, gone fishing; Mrs. Moore sick, Mrs. Bailey sick, Mrs. Scruggs sick, Mrs. Delia sick."

Thus it is shown that all twelve of the jurors were sworn and testified fully on the hearing of the motion for new trial. All but one did some talking over the 'phone. Eight of the eleven who did talk were corroborated fully by some or all persons to whom they talked. One England lived in the Riesel community. Why the persons to whom he talked were not sworn and examined does not appear. Another, Moore, lived at Robinson. It seems his mother and wife were attempted to be procured on this hearing, but could not be—one because of absence, the other because of sickness. The only other juror, who was not corroborated by having the person to whom he talked testify, was Duncan, and this was because the lady to whom he talked was sick and could not be had.

All of this testimony on the hearing of this motion bears intrinsic evidence that it was natural and reasonable and probable that their testimony is true and it drives conviction to the mind, beyond controversy, that it is true. It shows, without doubt, that the appellant was not in any way injured by any or all of these conversations over the 'phone. So that we hold that the burden by the State to show that there was no injury to appellant was fully met by the State. Early v. State, 103 S. W., 868; Speer v. State, 57 Texas Crim. Rep., 297.

We would not have it understood that we, for a moment, sanction such practice by jurors, but on the contrary we condemn it because this case is a fair sample of the unnecessary expense and delay and trouble to which the parties and the State are put to meet the issue when such conversations are held. We urge the trial courts to caution, and if need be compel the officers in charge of the jury and the jurors themselves to desist from any such misconduct.

7. A suggestion was made in oral argument, but it is not complained of in the motion for rehearing that the verdict of the jury did not convict appellant on count three of the indictment, and that it is not certain that the verdict of the jury is on that count at all.

On this point the verdict of the jury is clearly to the contrary of this suggestion. It is: "We, the jury, find the defendant guilty under count No. 3, as charged in the indictment and assess his punishment at two years confinement in the penitentiary. M. A. Sullivan, foreman." Count No. 3 of the indictment is one of the four specifically submitted to the jury by the charge of the court, and by the charge of the court it is clearly identified as No. 1 in his charge. In addition to this, in the brief of appellant's attorneys they

say that "appellant was convicted of keeping a room for the purpose of being used as a place to gamble with cards," and this count in the indictment is the only one charging the defendant under the statute with that offense. So that, in our opinion, there is no doubt whatever that the verdict of the jury by its terms, in connection with the indictment and the charge of the court, fixes that the appellant was convicted; and the verdict of the jury was on the said count three in the indictment.

The motion for rehearing is overruled.

*Overruled.*

Harper, Judge, concurs.

DAVIDSON, Presiding Judge (dissenting).—I have been unable to give my consent to the disposition made of this case by the majority of the court, and shall, as briefly as I may, write my reasons for withholding my approval.

1. Appellant presents by proper bill of exceptions objection that the Act of the Thirtieth Legislature, page 107, is unconstitutional, in that the same is passed in violation of section 38, of article 3, of the State Constitution, that section is as follows:

"Section 38: The presiding officer of each house shall in the presence of the house over which he presides, sign all bills and joint resolutions passed by the Legislature after their titles have been publicly read before signing, and the fact of signing shall be entered on the journals."

The specific objection to this bill is that the journals of both the house and senate not only fail to show that the Act was signed as contemplated by the above section of the Constitution, in the presence of the respective bodies, but on the contrary, conclusively show that the true title to the Act was not read, and that no such bill as the one published and promulgated as law, was in fact signed either by the speaker of the house or president of the senate, in the presence of their respective bodies as required. The journals of the house show, as is made to appear by the bill of exceptions, that House Bill No. 84 was introduced in the Legislature by Mr. Dean, on January 14, 1907, and that its caption then was "House Bill No. 84, entitled 'An Act to amend article 388 of the Penal Code of the State of Texas, so as to make it unlawful to bet at a game played with dice at any place.'" This, according to the journal purports to be the entire caption of the title as introduced. After various other proceedings in both the house and senate, and by free conference committee, as shown by the bill of exceptions, the journal of the senate has the following entry, pages 794-5: "Bills and Resolutions signed. The Chair (Lieutenant-Governor) gave notice of signing, and did sign, in the presence of the senate, after their captions had been read, 'House Bill No. 84.' 'An Act to amend article 388 of Penal Code of the State of Texas, so as to make it unlawful to bet at a game

played with dice at any place.' " House journal, pages 1154-5, has the following entry:

"Bill signed by Speaker. Speaker signed today in the presence of the house, after giving due notice thereof, and their captions had been read severally, the following bills: 'House Bill No. 84.' 'An Act to amend article 388 of the Penal Code of the State of Texas, so as to make it unlawful to bet or wager at any gaming table or bank or pigeon hole or jenny-lind table, or nine or ten pin alley, such as are mentioned in the six preceding articles, or to bet or wager any money or other thing of value at any of the following games, viz.: poker dice, jackpot, high dice, low dice, dominoes, euchre with dominoes, etc., providing for the search for and the seizure of any gambling device, equipment or paraphernalia and its destruction; and generally to suppress gambling; repealing all laws in conflict herewith, and declaring an emergency."

This is all there is in the journals as evidence of compliance with the section of the Constitution referred to. The title of the bill, as actually promulgated in the Acts of the Thirtieth Legislature, page 107, is as follows:

"An Act to amend article 388 of the Penal Code of the State of Texas, so as to make it unlawful to bet or wager at any gaming table or bank or pigeon hole or jenny-lind table, or nine or ten pin alley, such as are mentioned in the six preceding articles, or to bet or wager any money or other thing of value at any of the following games, viz.: poker dice, jackpot, high dice, high die, low dice, low die, dominoes, euchre with dominoes, poker with dominoes, sett with dominoes, muggins, crack-loo, crack-or-loo, or at any game of ·any character whatever that can be played with dice or dominoes, or at any table, bank or alley, by whatever name the same may be known or whether named, or not, or matching for money or anything of value; also by adding to said Code articles 388a, 388b, 388c, 388d, 388e, 388f, 388g, 388h, 388i, 388j, 388k, 388l, 388m, and 388n, making it a felony punishable by confinement in the penitentiary for any person directly, through an agent, or as agent for another, to keep any house, or place to gamble with cards, dice, dominoes or upon anything whatever, or where people resort for such purpose or to exhibit for the purpose of gaming, any table, bank, alley, machine or device whatsoever; or to rent or keep any such place, table, bank, alley, machine or device whatsoever for the purpose of gaming; providing for the search for and the seizure of any gambling device, equipment or paraphernalia and its destruction; and generally to suppress gambling; repealing all laws in conflict herewith, and declaring an emergency."

It will be seen by comparison that the journal of the senate shows that the title of the bill, as originally introduced, was read in the house, and that a bill containing that title and number 84 was signed by the Lieutenant-Governor, in the presence of the senate. The journal of the house shows that a certain bill No. 84, containing an

entirely different title, was read in the senate, and signed by the Speaker. This title, as read in the house, however, is not as stated by a majority of the court in its opinion, merely a part of the caption of the title of the bill as promulgated; on the contrary, the caption read in the house composes in the main about the first six lines, and the last four lines, substantially, of the caption of the title to the bill promulgated, while the title read in the senate is entirely different from either. The majority opinion holds, and I think correctly so, that the fact of signing "must affirmatively appear in the respective journals." It is my opinion that these recitations from the journals do not show the fact that the bill promulgated as law was in fact signed in the presence of the respective houses, in the manner required by the Constitution. If the journals show anything, the journal of the senate shows that a bill with the original title, which was only about two lines in length, was signed, and all had reference to changing the law relative to one misdemeanor, and the journal of the house, if it shows anything, shows that a bill No. 84 was signed with caption of about ten lines in length with an enlarged scope for its purposes, while the bill promulgated as a law is entirely different in its purpose and scope from either of the bills shown to have been signed, either in the house or the senate, and covers entirely new fields of legislation.

Now, if we accept these journals for any purpose, they must be accepted for all purposes, and if they show anything at all they show that the bill promulgated as a law was never in fact signed in either house, nor was the caption thereof ever read publicly before signing, as required by the Constitution.

The section of the Constitution referred to, when narrowed down to the point at issue, reads: "The presiding officer of each house shall in the presence of the house over which he presides sign all bills . . . passed by the Legislature, after their titles have been publicly read before signing, and the fact of signing shall be entered on the journals."

"The fact of signing shall be entered on the journal." What is "the fact of signing?" Does it mean the physical act? If so, how could this physical act be entered on the journal? What kind of an entry would be made? How are we to know what bill was signed, unless we hold the fact of signing to mean the character of signing spoken of in the Constitution? What signing is there described? The signing after the title has been publicly read. How are we to know this fact? By reference to the journal which article 3, section 12, of that same instrument provides shall be kept. If this is not the true construction of this article, then there is no way of determining that "the fact of signing" any particular bill has been complied with. It will not be permitted to look to the number for identification, and ignore the title when it forms a necessary part of the very evidence sought to be used, nor can any part of the journal be used as evi-

dence when it suits the purpose of identifying the bill that was signed, and discard the same when it shows that the bill signed was not the one promulgated as law. It can not be said the journal is evidence in behalf of the validity of the law, and ignore it when sought to be used for the opposite purpose. It can not be said this different title, which the journal shows was read, was just an error of the clerk, when we are speaking of the minutes of a deliberative body that are required by the organic law to be kept, and which, as a matter of common knowledge, are daily published, read and corrected by members of that body. The truth, as it appears to me, is that there is no way of knowing "the fact of signing" any bill, is entered in the journal, unless we go to that journal for description, and when this is done we must accept its verdict. I am, therefore, of the opinion that the bill of exceptions in this case, and the journals of the house and the senate, fail to show even "the fact of signing" of the Act under which this prosecution is had, as required by law.

I am further of the opinion that these journals each conclusively show that the title to the Act was not publicly read, as required by the Constitution. The matter seems to have been lost sight of, that though the bill, title and all, which was promulgated as law, was in fact passed, or if the clerk by mistake, or otherwise, as the journal conclusively shows, did read, as its title, just before signing, something materially different from its true title in place of reading its true title, and that fact is properly before this court in a way requiring that it must be considered, then this would nullify the proposed law, and the bill of exception before this court, which is true according to the journals of the respective branches of the Legislature, can not be held to show "the fact of signing" any bill and entering the same in the journal, without also in this case, by the same evidence, showing that this title was not publicly read, as required.

I quote with approval the following paragraph of appellant's brief on motion for rehearing: "We further think that even under this court's opinion, which we admit is supported by some general authorities upon the point decided in the first paragraph of the opinion that where the Constitution requires that a record of the signing shall be made, that it further evidently, by a proper rule of construction, required that the caption of the bill so signed and required to be read should also be entered on the journal in order that it might definitely be determined what bill was signed by the Speaker or Lieutenant-Governor." Let us see: The Constitution evidently meant some thing. It meant to guard against something when it said that the signing should be shown of record. Now, if the signing of a bill, though by a proper number, having an entirely different caption, meets the requirements of the Constitution as held by this court, then what is the object, purpose or beneficial effect of this clause of the Constitution? Its whole object is destroyed if this bill is held good. Our contention is that the signing means the signing spoken

of by the Constitution, that is, that the titles were publicly read and the bills signed, and this entire fact must be shown by the journal. "The fact of signing" means the fact of signing under the conditions and with the formality as is required by the same section and the same sentence of the Constitution. We can not for the life of us see that any other construction is other than a plain evasion of the solemn mandate of the Constitution which was enacted for the stability of the government and for the protection of life and property, and to prevent wire working, scheming and fraudulent engineering of legislation through the house and senate to the injustice and injury of the people.

"If this construction applies in this case it must apply in other cases where it is positively known that crookedness and corruption were practiced, and though the evidence be abundant to show this fact. This opinion will stand as a precedent to prevent an investigation and to destroy the bulwark of protection. If the court feels that it is bound by former decisions to the extent announced in paragraph No. 1 of its opinion, we do earnestly suggest to the court that they do not carry this, as we conceive, erroneous construction further and thereby destroy section 38 of article 3. We think it is going far enough when the courts say that though the Constitution requires a thing shall be done, yet we hold you must not and can not show it was not done. For why evidence upon this point is not admissible we do not yet on principle understand. We can't exactly understand what remains of the obligation of every citizen, and especially of every officer, that he will uphold the Constitution when the higher courts say the Legislature may violate it with impunity, and though the evidence be abundant and absolutely conclusive, that under our form of government it will be permitted and not allowed to be questioned."

I have said this much upon the rule of construction adopted by the majority of the court, that only that part of section 38, as follows: "And the fact of signing shall be entered on the journals" is mandatory, and that the other is either merely directory, or if ignored by the Legislature, the law will presume conclusively that it has been complied with, though the journal evidence of its violation be abundant. I will not enter into a discussion at length upon the question of the correct rule of construction of constitutional provisions in general, or all of section 38 of article 3 of our State Constitution in particular. Suffice it to say, that most of, if not all, the sections of article 3 were intended by the framers of the Constitution as limitations upon the powers, acts and conduct of the Legislature; that the framers of our organic law had a purpose in placing these limitations in that instrument, and if they may be ignored at will by the Legislature, and the State or the citizen held powerless to show that they have been violated, then it seems that they were written in vain, and have no place in such an instrument. This,

though the people, the source of all power under our form of government, uttered them not as entreaty, but as a command. They are not in the form of a supplication, but their purport is "Thou shall not."

I will not discuss this further, but content myself by saying that I agree fully with the reasoning, the logic, and the conclusion reached by the court, speaking through Judge Willson, in the case of Hunt et al. v. The State, in 22 Texas Crim. App., 396, as was reaffirmed by the same court, speaking through Judge Hurt, in the case of Ford v. The State, 23 Texas Crim. App., 520, and again reaffirmed by the same court in Wright v. The State, 23 Texas Crim. App., 313. I am aware that there is high authority to the contrary, both in this and some other States, yet, so long as I am given authority to construe the instrument which gives this court life, I shall always be constrained to hold that the voice of the people, speaking through their Constitution, is supreme and must be obeyed by each of the three branches of the government. The people created their government and its various branches, and the created are not greater than the creator.

2. Appellant was convicted of keeping room number six (6) in the Waverly Hotel for the purpose of being used as a place to gamble with cards. This conviction was had under one of the subdivisions of article 388b of the Penal Code. Appellant contends that this article of the Penal Code, or at least the subdivision of the same under which he was convicted, was repealed by the Act of 1909, Thirty-First Legislature, page 111, defining and punishing vagrancy.

Article 388b makes it a penal offense punishable by confinement in the penitentiary for any person to keep any premises, building, room or place for the purpose of being used as a place to bet or wager, or to gamble with cards, dice or dominoes. Article 388f declares a gambling house and gaming house means any place where people resort for the purpose of gaming, betting or wagering.

The vagrancy Act above referred to declares that any keeper of a house for gambling or gaming is a vagrant and shall be punished by fine in any sum not to exceed ($200) Two Hundred Dollars.

Is the act of keeping a house for gambling or gaming the same as the act of keeping premises, building, room or place for the purpose of being used as a place to bet or wager or gamble?

A gaming or gambling house is thus defined: "The term gaming houses, the keeping of which is an offense, includes every house, room or place which is owned, occupied, controlled or kept as a resort or place of gathering for the purpose of gambling, wagering, or betting." 8 Am. & Eng. Ency. Law (1st ed., p. 166).

This definition is substantially the same as the definition quoted and approved by this court in Miller v. State, 35 Texas Crim. Rep., 651. Article 388b as above shown makes the keeping of a building,

Vol. LXII Crim.—15.

room or place for the purpose of being used as a place to bet, wager or gamble an offense, and article 388f makes the test of such use the fact that people resort there for the purpose of gaming, betting or wagering. It requires no argument to show that identically the same acts and conditions which make a person amenable to the penalty prescribed by article 388b make him also amenable to the penalty prescribed by the vagrancy Act. There is no essential element contained in one offense which is not also found in the other. I am therefore forced to the conclusion that the majority of the court are in error in holding that the vagrancy Act creates a new 'and distinct offense from that denounced by article 388b, of the Penal Code. Is the vagrancy Act, and especially subdivision (k) thereof, a valid and subsisting law?

The duty of enacting effective vagrancy laws is enjoined on the Legislature by the Constitution. The Legislature had undoubted right to determine what act, or acts, shall constitute a person a vagrant, and to prescribe a suitable punishment for the same. In the exercise of this constitutional right the Legislature passed the vagrancy Act above referred to and made a great number of distinct and diverse acts constitute a person a vagrant. Among these acts is the keeping of a gambling or gaming house, as provided by subdivision (k) of said Act.

It can not be doubted that the Legislature intended what it has clearly and unequivocally expressed, to wit: that every keeper of a gambling or gaming house shall be deemed a vagrant and shall be punished as such.

Section six (6) of the vagrancy Act expressly provides that all laws and parts of laws in conflict therewith are repealed. It is clear that the Legislature thereby intended that every keeper of a house for gaming or gambling shall not only be a vagrant under the law, but that he shall be convicted and punished as such and that any and all laws in conflict therewith shall be repealed.

Article 388b being in irreconcilable conflict with subdivision (k) of the vagrancy Act is necessarily embraced in the terms of the express repeal and would be repealed by implication if no repealing clause appeared in the vagrancy Act. Fleeks v. State, 47 Texas Crim. Rep., 327, 83 S. W. Rep., 381; Robinson v. State, 2 Texas Crim. App., 390; Smith v. State, 44 Texas, 443; State v. Taylor, 85 S. W. Rep., 564; State v. McKee, 104 S. W. Rep., 486; 36 Cyc., p. 1095 F.

After enacting that all laws and parts of laws in conflict with said vagrancy law are repealed the same section continues: "Providing the penalties herein named shall be cumulative and a conviction for any offense herein named shall not be a bar to any other prosecution under any other criminal statute."

I am unable to agree with the majority of the court in their construction of this proviso. The Terrell Election Law (Acts 28th Leg., 158), provided in section 144 thereof that said Act should be cumu-

lative as to penalties for violating the election laws of the State, as to the mode and manner of any law except such laws as are inconsistent with it, or in conflict therewith. This section of said Act was before this court for construction in the case of Fleeks v. State, 47 Texas Crim. Rep., 327, 83 S. W. Rep., 381, and this court held that although said section of said law made the same cumulative as to penalties it must be held to repeal former laws concerning the same prohibited acts.

I think the proper construction of this section of the vagrancy Act is that the Legislature intended that the acts therein denounced should constitute vagrancy and should be punished as therein provided, and that such punishment should be cumulative.

This attempt to make the punishment of the vagrancy Act cumulative is contrary to the express provisions of the Bill of Rights, and therefore null and void. Being void in itself, it necessarily falls and leaves the vagrancy Act in full force and effect as though no such illegal and void provision had been incorporated therein.

3. I can not agree with the opinion of the majority of the court in holding that there was "no such misconduct of the jury shown as requires a reversal of this case." My opinion is that the facts shown by the bill of exceptions in this case bring the misconduct of the jury clearly within the rule announced by Judge Henderson, in Early v. State, 51 Texas Crim. Rep., 382, 103 S. W. Rep., 873. The officer in charge of the jury, and one of the jurymen, testified that almost, if not all, of the jurors after being empaneled and sworn in the case, and without the consent of the court, held one or more conversations of varied lengths with persons unknown to the officer, and that the officer did not pay any attention to the conversations, know who they were talking to, or what they said. The State introduced each of the jurors in rebuttal, and with one exception, each of them testified that he had one or more conversations over the 'phone of various lengths, and gave the names, according to their testimony, in most instances, of the persons to whom they talked. A number of these persons were brought before the court and corroborated the jurors. Without, at this time, considering those conversations where the persons to whom the juror purported to talk were brought before the court and testified that the conversations were innocent, the juror W. W. Moore testified that he talked to his wife and mother, one conversation with each, but neither Mrs. Moore, Sr., nor Mrs. Moore, Jr., were brought before the court. J. T. Duncan, another juror, said he talked to his next-door neighbor, Mrs. Scruggs, twice. Mrs. Scruggs was never brought before the court. J. S. England, another juror, testified that he talked to McClain's livery stable in Waco, and to a Mrs. Kayser at Riesel. Neither the person he talked to at the livery stable, whom he did not identify in his testimony, or Mrs. Kayser, were brought before the court, so in my opinion three of these jurors, having improperly held conversations over the tele-

phone with unknown persons, each of them on two different occasions, and there being no evidence as to who they talked to except their own, and no explanation made of what the conversation was about, except such as was made by the jurors themselves, I hold that the case is in identically the same condition as if no explanation had been made with reference to any of the jurors, for if a violation of the inhibition of the law by three of the jurors is not sufficient to require a reversal, then a violation by each or all of them of a similar character would not be sufficient. It must be borne in mind that save and except from the jurors themselves we have no evidence from any source as to who they talked with, because the officer in charge says he does not know. I endorse the entire opinion of Judge Henderson in the case of Early v. State, supra, and shall quote from the same at length. After quoting article 728 of the statute, to the effect that no person shall be permitted to have conversation with a juror, after he has been empaneled, except in the presence and by the permission of the court, and disposing of the proposition that a conversation by a juror over the telephone with another person is nevertheless a conversation, Judge Henderson says: "It is insisted that where it is shown that a conversation occurred between members of the jury and others over the 'phone not in the presence and not by permission of the court, as here, either one of two rules should apply: First, that it will be absolutely presumed that injury occurred to appellant; or, if this presumption is not indulged, that the burden is on the State to show that such injury could not have occurred. With regard to this misconduct of the jury, which related to their separation, which is analogous to the proposition herein involved, since McCampbell v. State, 37 Texas Crim. Rep., 607, 40 S. W. Rep., 496, the doctrine therein announced has been followed without a break, to wit: That where a separation of the jury trying a felony case has been shown, and opportunity presented for the juror or jurors to be tampered with, injury to appellant will be presumed. Whether this rule be applied and adopted here, or the milder one to the effect that where jurors are shown to have conversed with others, the burden is then on the State to show what the conversations were about, and that no possible injury accrued to appellant, the result, so far as this case is concerned, must be the same. On the examination of this issue before the court, some of the jurors were examined, but not all. They stated that they talked with their wives, and in one instance one of the jurors with another lady neighbor about home matters. All of the jurors were not examined. The deputy sheriff was examined. He heard some things that the jurors said, but he could not hear what was said at the other end of the line. None of the parties who conversed with the jurors were summoned or examined. Heretofore we have held with reference to the separation of jurors that these would be liable if tampered with to suppress the fact, and that therefore little reliance should be placed on their testimony,

and the same rule would apply with reference to conversations. So that the necessity for the examination of others than the jurors with whom such conversations may have occurred seems to be necessary. This was not done. We accordingly hold that the burden thus shifted to the State was not discharged by it. We believe in the face of these statutes above cited that it would be a bad precedent to hold that jurors out of the presence of the court, and not by permission of the court, should be permitted to converse, with other persons over 'phones, and certainly where such conduct does occur it should be held obligatory on the State to show beyond any question that the jurors were not tampered with. Any other rule would destroy a barrier set up by the Legislature intended to protect the purity and integrity of the jury box."

Under this ruling I can but see that this case should have been reversed upon the misconduct of the jury. It is true the jurors in this case may have been honest men, and this court, to reverse this case upon the misconduct of the jury, is not called upon to cast any aspersion upon them as such. It was not the honest juror who necessitated the statute inhibiting all character of conversation with the jurors after being empaneled and sworn, but it was the mercenary and dishonest one who occasionally finds his way to the jury box that provoked this legislation; it was to protect the citizen in such an emergency against possible injury that the statute was written, and by reason of the fact that the law could not look into the consciences of men, the application of the statute was made universal. It is the dishonest juror who would be first to acclaim the sincerity of his purpose—loudest to profess the sanctity of his oath, and the last to admit anything bordering upon impropriety on his part. Not being allowed to accept the unsupported evidence of a juror, as to the name of the person with whom he talked, and the character of the conversation he held with such person, in this case we are left at sea, so far as knowledge acceptable to the law goes, as to the identity of the persons with whom any of the jurors talked, for the officer does not profess to say that the jurors in their testimony enumerated all of the conversations they had or gave correctly the name of the persons to whom they talked. I am of the opinion that both the statute and the rule announced in the Early case are wisely provided safeguards around the purity of the jury system and should be observed to the letter. McCampbell v. State, 37 Texas Crim. Rep., 807.

4. There is one other question raised by appellant upon which I can not agree with the majority opinion. This is in regard to appellant's application for a continuance, and I will express myself briefly upon the principle involved. Promptly upon indictment on the 11th of March, 1909, the appellant caused subpoena to be issued in the case to McLennan County for the witness George Weathered. The case was at that time set for 24th of March, 1909, and the subpoena

was returnable to that date. The subpoena was duly executed on the 15th of March by summoning the witness. On the 17th of March the trial court made another order resetting this case for March 29. In my opinion it was then unnecessary for any witness, or even the defendant, to attend court on the 24th of March, when he knew that the case would not be called until March 29, and the defendant was not called upon to attend court and call`his witnesses on March 24, nor was a witness who was absent on March 24 in disobedience to his subpoena, because the order of the court changing the setting amounted to a command, and the witnesses took notice to be present on the 29th, and that they were excused from attendance on the 24th. Appellant would not have been entitled to an attachment or other process for a witness who was absent on the 24th, unless the conditions or his knowledge were such as to bring him within some of the statutory exceptions and would justify him in making an affidavit for additional process. The witness George Weathered was not present on the 29th when the case was called for trial, and the defendant made his first application for a continuance in proper form on account of his absence. The facts which he alleged he expected to prove by the witness were highly material to his defense, and while the court in the majority opinion intimates that if the witness had testified to the facts set out in the application, they would not probably have been true, still they do not base the determination of the issue upon that point, and further the defendant is entitled to have the facts passed upon by a jury, and ordinarily it is not proper for either the trial court or this court to be called upon to say whether the facts alleged, if testified to, would probably be true or untrue. This is a matter which our Constitution guarantees shall be entrusted to the discretion of a jury, and the defendant is entitled to have all of his case presented to that jury, if he is diligent. The application for a continuance says that the witness, during the interim between March 17, the date on which the order was made resetting the case, and March 24, the date on which the case was originally set for trial, was notified of the resetting, and had never disobeyed his subpoena until the 29th, when he was absent; the majority opinion holds that this amounted to the defendant taking upon himself the duty of producing his witness on the 29th, and substituting himself for the process of the court. I do not think this is correct. On the contrary, I think it was the duty of the appellant to notify the witness, and if the witness was local it would save him the trouble of attending court, and if foreign, it would save the State the expense of an unnecessary trip of the witness to the court. The court had no use for the witness until the 29th, and would not have recognized him had he put in an appearance. The subpoena taken in connection with the order of the court was notice, and a demand upon the witness to be on hand on the 29th, and not before. It was doubtless to avoid the necessity of having all the witnesses attend court on the 24th, when

it was evidently known that the case would not be tried on that date, that the court called the case up on the 17th, several days in advance, and reset it for the 29th. This was a proper consideration on the part of the court for the witness, and for the finance of the State. I am of the opinion that the application for a continuance was good, and that the court erred in not granting said application, and in overruling the paragraphs in motion for new trial based upon said application, and that this court is in error in not sustaining appellant's contention upon this point.

The above are some of the reasons why I can not agree with the majority opinion. I dissent.